## CHARLOTTE E. SNYDER *v.* HENRY MARVIN SNYDER.

[Nos. 8, 10, April Term, 1930.]

*Decided June 24th, 1930.*

The causes were argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*C. Ferdinand Sybert,* for the appellant.

*James Clark* and *James E. Boylan, Jr.,* with whom were *Bond & Boylan* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appellant, Charlotte E. Snyder, an infant under the age of twenty-one years, by her father and next friend Robert W. Carter, on the 26th day of August, 1929, filed her bill against the appellee, Henry Marvin Snyder, in the Circuit Court for Howard County, in which she alleged that on the 6th day of December, 1928, she was married to the defendant, with whom she resided in Howard County until the latter part of June, 1929, when they went to her father's home in Carroll County, and there resided until on or about July 9th, of the same year, at which time the defendant "without any just cause or reason abandoned and deserted"

her. In addition thereto the bill alleged that the defendant, on divers days and times after their marriage and before the filing of the bill, committed the crime of adultery. The bill further alleged that the defendant was a man of large means, the owner of a farm in Howard County, worth at least $20,000, together with personal property of the value of $7,000, from which he derived an annual net income of between $3,000 and $5,000; while she was destitute, without property or means with which to support herself and child, or to defray the costs and expenses of the suit. It was also alleged in the bill that the defendant had sold and disposed of a large amount of his personal property, and was attempting to dispose of his farm and the balance of his personal estate, so as to deprive the plaintiff of her interest and rights therein.

The prayers of the bill are: (1) That she be divorced *a vinculo matrimonii* from the defendant. (2) That she be given the care and custody of their infant child. (3) That the defendant be required to pay to her such sum or sums as the court may deem right and proper for the support and maintenance of herself and child, both during the pendency of the suit and permanently thereafter, and for the expenses of this suit, including a reasonable counsel fee to her solicitor. (4) That pending the suit, or until the further order of the court, the defendant be restrained from disposing of any of his property. (5) For general relief.

Upon the filing of the bill, a conditional order was passed for the payment to the plaintiff of fifteen dollars a week as alimony and a counsel fee of fifty dollars for her solicitor, and also an order restraining the defendant from disposing of his property pending the suit, or until the further order of the court.

The defendant, on the 9th day of September, answered the bill, denying the alleged abandonment and desertion of the plaintiff, and also denying the charge of adultery. On the same day he filed a cross-bill alleging that Charlotte E. Snyder, his wife, had abandoned and deserted him, and

asked that he be divorced *a mensa et thoro* from her, and that he be given the care and custody of their infant daughter. On September 19th, 1929, the wife, Charlotte E. Snyder, filed her answer to the cross-bill, in which she denied the allegation that she had abandoned and deserted her husband, Henry Marvin Snyder.

The court, after hearing evidence upon the issues thus presented, passed its decree on the 18th day of October, 1929, by which both the bill and cross-bill were dismissed and the injunction dissolved, and by it the defendant to the original bill was ordered to pay the costs of the proceedings and the counsel fee of fifty dollars, which he had been directed to pay to the plaintiff by the previous order of the court and which he had not paid. From this order the plaintiff appealed to this court.

Thereafter on the 16th day of November, the court, upon the petition of the plaintiff, ordered and directed the defendant to pay the costs of the appeal so taken by the plaintiff, including counsel fee of fifty dollars for plaintiff's solicitor for prosecuting the appeal, and further ordered that he pay to the plaintiff the sum of ten dollars per week from the 26th day of August, 1929, to the determination of the case on appeal. The plaintiff appealed from that part of the order allowing fifty dollars as counsel fee.

The defendant thereafter petitioned the court, alleging that he had been unable to pay the amounts owing to his creditors and "several of them levied on his personal property and tied up his affairs to such a degree that he was forced, on the twenty-first day of December, 1929, to convey all of his property to James Clark, in trust for the benefit of his creditors." The Circuit Court for Howard County assumed jurisdiction of the administration of the trust and, as a result of the trust so created, he had no money available for the payment of the alimony, costs, and expenses, which he, by the order of November 16th, was directed to pay, and he asked the court to reconsider its order of November 16th, and to pass, in lieu thereof, such order as it might deem

right and proper. Upon this petition the court passed its order of January 13th, 1930, in lieu of its order of November 16th, 1929, excusing the defendant from the payment of the alimony he was directed to pay under the earlier order of November 16th, though the defendant by such order was to pay the counsel fee of fifty dollars, which he had been directed to pay under the rescinded order. Thereupon the plaintiff appealed from the order of January 13th, 1930. Upon reaching this court, three appeals were docketed, Nos. 8, 9, and 10, one from each of the orders of October 18th and November 16th, 1929, and January 13th, 1930, although the order of November 16th, 1929, had been rescinded, and the order of January 13th, 1930, passed in lieu of it. Consequently no appeal should have been docketed from the order of November 16th, 1929, but only from the decree of October 18th, 1929, dismissing the bill and cross-bill, and dissolving the injunction, and the order of January 13th, 1930, disallowing alimony and directing the allowance of fifty dollars as counsel fee for the prosecution of the appeal. Assuming that the cases were docketed in the order in which the appeals were taken, the appeal in No. 9 from the order of November 16th, 1929, will be disregarded, and no costs will be allowed in such case.

We will first consider the appeal from the decree in No. 8, dismissing the bill and cross-bill, and dissolving the injunction.

The plaintiff in the original bill, Charlotte E. Snyder, was at the time of her marriage, on the 6th day of December, 1928, about seventeen years of age. After her marriage to the defendant, Henry Marvin Snyder, aged twenty-two, she went to the home of her father and mother at or near Sykesville, in Carroll County, for about two months, and from there she went to the farm of her husband in Howard County, where she resided with him until June 19th, 1929, at which time the baby born to them was taken sick, and she with her husband returned to the home of her father and mother, and there lived together until the 9th day of July of the same

year, when he left, and since that time they have not lived together as man and wife.

After deserting his wife at the home of her parents in July, we find the defendant in the same month a frequent visitor at the home of the Wards, a few miles from Sykesville, in which family there were several single daughters, and staying with them was a young woman, Miss K., to whom we will hereafter refer as the "co-respondent." In the month of August following his separation from his wife, the defendant attended a dance at Randallstown, in Carroll County, in an intoxicated condition, and there danced with the co-respondent. On this occasion he was seen talking with her for ten or fifteen minutes near the dance hall, when it was arranged that she, on the next day, Sunday, should accompany him in his automobile to Harrisburg, Pa. On the following morning, at 11 o'clock, they left the Ward home for Harrisburg. They took lunch at that place, and thereafter drove ten or fifteen miles beyond Harrisburg before starting home. They reached the Ward home, as they testified, about nine o'clock in the evening. Millard Carter, a brother of the plaintiff and also a frequent visitor at the Ward home, where he had many times seen the defendant during said months of July and August upon the latter's visits to these young women, testified that, between ten and eleven o'clock in the night of that day, the defendant and the co-respondent were seen by him, in the defendant's car, parked on a bridge in the road or lane leading from the public road to the Ward home, about thirty or forty feet from the state road and about eighty feet or more from the Ward house, facing the latter place. Millard Carter at that time was returning to the Ward home from a ride with one of the Ward girls. When he reached the car of the defendant his way was blocked, as the bridge was a one way bridge. He recognized the car to be the car of the defendant, and called to him saying, "What are you doing parked here?" and the defendant backed his car off the bridge out again in the state road, and went towards Eldersburg, which is between the Ward entrance and Sykesville. Those in the automobile were recognized by Carter as being

the defendant and the co-respondent. It is not clear from the evidence whether the defendant with the co-respondent went up to the Ward house, reaching there at nine o'clock, and thereafter went out in the car again, or whether, upon reaching the bridge in the lane or road, a short distance from the house, at nine o'clock, they remained upon the bridge until ten or eleven o'clock, when seen there by Carter. Carter further testified that, after going to the Ward house, where he remained for about a half hour, he returned to the state road and proceeded on his way home towards Sykesville. While on this road, not far from the Ward home, he saw an Oldsmobile roadster parked about one hundred feet in the woods. He could not see who was in the car, but the car was like the one owned and driven by the defendant, and like the one in which he had seen Snyder and the co-respondent only a short time before on the bridge, and he knew of no other car like it in or around Sykesville.

The defendant, as well as the co-respondent, admitted that they were in the car on the bridge where Carter said he saw them, and that they backed their car out upon the road, but, as stated by them, upon reaching the state road they went towards Westminster and not towards Eldersburg, and while both the defendant and the co-respondent were familiar with that section of the county, their statements as to the distance they went and the towns through which they passed, if any, and the time at which they reached the Ward home upon their return from that trip, were very indefinite. They said they remained out upon the road in order that Carter could go to the house and return to the road without seeing them, as they did not wish him to know that the co-respondent was the one in the car with the defendant, the husband of his sister, when seen parked upon the bridge, notwithstanding the fact that they both knew that Carter was fully aware of Snyder's frequent visits to the Ward house to see the daughters and co-respondent.

The co-respondent in her testimony stated that Carter could not have seen her in the car for, as said by her, "I was sitting low in the seat so I slid down in the bottom. Q. Why didn't

you want him to see you? A. Because I didn't want any one to know it. Q. Why did you stop on the bridge? A. Because he (the defendant) didn't want Bill (Carter) to see him." She further stated that the curtains were on the car; that in the afternoon or evening of that day it had rained and they were not taken off after the rain. She admitted it was warm on that day, but after the rain it got cold. She was asked if the curtains would not hide her identity and she replied "They would." And when asked if that was the reason they were left up, she said, "I don't know whether it was or not." She denied that she was with the defendant in his car in the woods that night, and also denied that she had ever had any improper relations with Snyder.

The defendant, as we have said, did not deny that he was with the co-respondent in the car parked on the bridge as stated by Carter, and, like the co-respondent, he testified that when he backed out upon the road he went towards Westminster and not towards Eldersburg; that he went up some distance towards Westminster and returned to the Ward home, not giving any definite time as to how long he was gone, and denied that he was with the co-respondent in his car in the woods that night. He was then asked by his counsel on redirect examination, "Were you ever in the woods with her?" and he replied, "No, sir. I might have been in the woods with her three, four, or five years ago, but I went with my wife before that, too." He, too, testified that he stopped on the bridge and did not go to Ward's house because he thought Carter was there, and he would tell Charlotte and create a lot of disturbance. "Q. You have been visiting Ward's since then? A. Yes. Q. And you have seen Bill (Millard Carter) there? A. Yes, sir. Q. Why did you think it was necessary to stop on the bridge if you were not afraid of him? A. I have seen Bill there before and I have seen him since. Q. Did you recognize Bill Carter when he went by? A. I don't think he did, when he went by he pulled down and said what the hell do you think you own that bridge, and I pulled out. Q. You recognized him? A. I guess he did recognize me. Q. If he recognized you, why didn't you go on in? A. Be-

cause he couldn't see who was in with me. This was the first time he had seen me with Miss K. to amount to anything."

In this case there is no direct proof of the commission of the adulterous intercourse between the defendant and the co-respondent, that is, there is no one that actually saw them commit the offense, and such evidence is rarely obtainable, because of the clandestine manner in which the offense is generally committed; and it is not essential that the parties be actually seen in the adulterous act, to establish their guilt. It is sufficient where the facts and circumstances proved are such as would lead the guarded discretion of a reasonable and just man to the conclusion of guilt. *Dicus v. Dicus,* 131 Md. 89; *Sterling v. Sterling,* 145 Md. 631. As this court said, speaking through Judge Boyd, in *Shufeldt v. Shufeldt,* 86 Md. 529, "it is not necessary to prove the direct fact of adultery, as it is rare that parties are caught in the act. 'In every case, almost, the fact is inferred from circumstances that lead to it by fair inference, as a necessary conclusion; and unless this were the case, and unless this were so held, no protection whatever could be given to marital rights.' *Loveden v. Loveden,* 4 Eng. Ecc. 461. It may be that some of the acts of the parties would alone only amount to imprudence, but as Sir William Scott once said on this subject, 'there may be, I must observe, imprudence of different kinds and degrees, and there are degrees of imprudence, from which a court of justice will infer guilt.' *Chambers v. Chambers,* 4 Eng. Ecc. 448. In the same volume, in the case of *Burgess v. Burgess,* he said, on page 529: 'In considering the legal effect of this evidence, I must proceed on the established doctrine of this court, as it has been laid down in various cases, that it is not necessary to prove the fact of adultery at any certain time or place, *modo et forma, loco et tempore.* It will be sufficient if the court can infer that conclusion, as it has often done between persons living in the same house though not seen in the same bed, or in any equivocal situation.' In *Chambers v. Chambers, supra,* it was said: 'Courts of justice must not be duped. They will judge

of facts, as other men of discernment, exercising a sound and sober judgment on circumstances that are duly proved before them. That a young woman estranged from her husband, and a young officer should be living together for months, and at different places, though under the flimsy disguise of separate beds, and that courts of justice should not put upon such intimacy the construction which everybody else would put upon it, would be monstrous.' "

If these well recognized principles be applied to the circumstances of this case and to the conduct of the parties here involved, would they not lead the guarded discretion of a reasonable and just man to the conclusion of guilt?

The defendant had been married only seven months when he, on July 9th, 1929, without any cause or reason, so far as the record discloses, left his wife and child at the home of her parents in Sykesville, where he had resided with them for about one month prior to that time. He never returned to his wife, but sought the company of young women of the neighborhood, one of whom was the co-respondent, whom he knew and with whom he had associations before his marriage, when she lived at the home of the Carters; and though he stated he was not with her in his car in the woods on the night of the day of their trip to Harrisburg, he admitted he had been with her in the woods before his marriage to the plaintiff, and he, as well as the co-respondent, admitted that they, on the night of the day named, were in his car upon the bridge in the Ward lane with the curtains of the car on, and that she, as stated by her, "was sitting low in the seat" and, to avoid being seen by Carter, "slid down in the bottom" of the car. They attempted to explain why they were parked upon the bridge that night by saying they did not wish to be seen by Carter, who, as we have said, was a frequent visitor at the Ward home, yet they place themselves in the position upon the bridge where they would necessarily be seen by him in either going to or returning from the Ward house.

The facts proved in this case, consisting as they do of the marriage status of the defendant, which was well known to the co-respondent, the admitted compromising position or sit-

uation of the defendant and the co-respondent upon the bridge, with no sufficient explanation, consistent with their innocence, of their presence there at such time; the fact that the defendant's car was seen in the woods so soon after it was observed by Carter upon the bridge, if believed to be true; and the all-day trip in defendant's car ending late in the night, after the members of the Ward family had retired, affording every opportunity for adulterous intercourse, are of such character that, upon the application thereto of the above stated rule, we cannot escape the conclusion of guilt.

We will next consider the appeal in No. 10, or the appeal from the order of the court of January 13th, 1930, which refused allowance to the plaintiff of alimony during the pendency of the suit, but allowed to her a fee of fifty dollars for her counsel in prosecuting the appeal, which amount was regarded by the appellant as inadequate therefor.

The plaintiff, who was without means or money with which to prosecute her suit, was entitled to alimony *pendente lite*. The amount of such alimony was to be determined by the court upon the financial means and ability of the husband. It is claimed by him that, because of the injunction restraining him "from disposing of any of his lands, or interest in same, live stock, farming equipment or other property," he was prevented from paying to her the alimony that he by the order of the court was to pay to her. The prayer of the bill asked that the defendant be restrained from "disposing of any of his property, including said farm and personal property." It was hardly intended by the court to make the injunction more sweeping in its effect, and the injunction should not, we think, be construed as applying to the sale of the crops raised upon the farm, as the sale of them was essential to enable the defendant to pay the costs and expenses of the cultivation and management of the farm, he having no other property or means with which to pay such costs and expenses. It was after the passage of the decree dismissing the bill and dissolving the injunction that the deed of trust to James Clark was executed. The execution of this deed should not, we think, be given the effect of defeating the pay-

ment to her of alimony, subject to prior valid liens, which had been previously ordered by the court, and while in our judgment she is entitled to a suitable award of alimony both *pendente lite* and permanent, in view of the fact that her bill for divorce should have been sustained, the amount of such allowance must be ascertained upon the present financial condition of the defendant, for should an attempt be made to require him to pay an amount larger than he is able to pay, it would be a fruitless undertaking, with no benefit to her. What we have said as to alimony will likewise apply to the adequacy of the counsel fee allowed. The plaintiff, in our opinion, being entitled to alimony, as we have stated, we will reverse the order appealed from and remand the case that further proceedings may be taken to determine not only the amount of alimony to be awarded her, but also the amount of the fee to be allowed her for counsel in prosecuting the appeal, as the amount of this fee will, to some extent at least, depend upon the financial ability of the appellee to pay the same. *Miller v. Miller*, 159 Md. 204.

The decree in No. 8 will be reversed and the case remanded that a decree may be passed in conformity with this opinion; while in No. 10 the order will be reversed and the case remanded that proceedings may be had for the determination of the amount of alimony, as well as counsel fee to be allowed her.

> *In No. 8, decree reversed and the case remanded for further proceedings in accordance with the opinion. In No. 10, order reversed and case remanded that further proceedings may be had for the purposes stated in the opinion. The appellee to pay the costs in both cases.*