HARRY S. MEEKS *v*. MADGE W. MEEKS

[No. 157, October Term, 1946.]

*Decided July 8, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Richard Carvell,* with whom was *S. Scott Beck, Jr.,* on the brief, for the appellant.

No brief and no appearance, but *Preston P. Heck* filed joint appendix with appellant for appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by plaintiff from a decree dismissing both his bill and defendant's cross-bill for divorce. The bill was filed on October 26, 1945 for divorce *a vinculo* on the ground of abandonment on March 20, 1944. The cross-bill (as amended) prayed a divorce *a vinculo* on the grounds of abandonment on March 25, 1944 and adultery with two named women since the alleged abandonment. In the lower court the case apparently was vigorously contested. In this court, as there was no argument or brief for defendant (appellee), it is practically an uncontested case. It has therefore been

deemed necessary that the entire record be read. We concur in the lower court's conclusions as to the facts, but shall add to the statement of facts in the opinion below, in order to indicate the grounds of our decision.

The parties were married January 2, 1924. They have a son born October 26, 1928. They lived together peaceably, on plaintiff's farm near Betterton, for about fifteen years. For the last five or six years their peace has been disturbed by (a) defendant's infatuation (evidently imaginary) for a Pennsylvania doctor whom she had once consulted professionally and (b) her repeated accusations against plaintiff of "running around with women." Plaintiff and the son say they were kept awake at night by long discussion of these two subjects. Defendant denies her infatuation for the doctor and, in part, her accusations about women, but plaintiff's testimony is corroborated by the son and by other persuasive evidence.

In March, 1944, defendant's mother, who lived in Betterton, was ill. Defendant had spent some time with her mother. On March 20th plaintiff says he took her from her mother's house to the farm to get some clothes; on April 2d she brought a truck to the farm and took away practically all the furniture; she told him (whether on March 20th or April 2d is not clear) she was leaving and was going to "fix" him. About this time one of defendant's brothers died in Pennsylvania. His widow is one of the so-called co-respondents named in the crossbill. Defendant says that after the funeral on March 25th plaintiff told her, at her mother's house, not to come back to the farm any more. Her testimony is denied by plaintiff and is wholly uncorroborated. Her other brother, called by her as a witness, says he was present when plaintiff and defendant were "arguing" on March 25th; he "didn't know what the argument was about," but "it was every bit her fault," because he has "lived with her for over the past year," "she's never satisfied, it's just argue all the time," "she makes up stories about Harry" (plaintiff). We think the removal of the furniture (which is not denied) and other credible evidence

satisfactorily corroborate plaintiff's testimony that defendant abandoned him. There is conflicting testimony as to how many times she went to the farm after the separation, but the number is small and there is no indication of desire or willingness on her part for reconciliation. She apparently did try to persuade the son to leave plaintiff and come to her.

Concerning the cross-bill the lower court says: "The court will consider first the cross-bill of the wife against the husband. Here there is no convincing and satisfactory proof that the husband deserted the wife, constructively or otherwise. In fact there is no evidence of such desertion on the part of the husband other than the wife's testimony which was not corroborated in the slightest degree. As to the alleged adulteries committed after the desertion had taken place, there is likewise no satisfactory and convincing proof. It is true, as the cross-complainant contends in her brief, that it is not necessary to prove the actual commission of the adulterous acts to establish guilt, and as was said in *Snyder v. Snyder*, 159 Md. 391, at page 399 [150 A. 873, 876]: 'It is sufficient where the facts and circumstances proved are such as would lead the guarded discretion of a reasonable and just man to the conclusion of guilt.' However, in the instant case the court is unable to find from the evidence such facts and circumstances which would lead it to conclude that the husband was guilty of adultery. True, he was grossly imprudent, of which more anon, but such imprudence was not of the kind and degree from which this court can infer the commission of adultery. For the reasons assigned the amended cross-bill must be dismissed."

It has been said that adultery is easy to charge, hard to prove and harder still to disprove. In the instant case (if that is what is meant by "running around with women") it has been lavishly charged, has not been proved, and has been discredited by direct denials and by the wholesale character and the improbable circumstances of the charges themselves. In the course of

five or six years, before and since her separation from plaintiff, defendant accused five different married women and her brother's widow. Three of the six accusations she denies having made, but the fact of these three accusations is testified to by two of the women accused and the husband of one whom she admits having accused. She told this man plaintiff was "running around" with his wife and another married woman. In her testimony her only specification is that she saw plaintiff at a restaurant, having breakfast with the woman and her husband. She accused a third married woman of "running around" with plaintiff and also arranging secret meetings for a fourth with plaintiff. The third woman says defendant later admitted that these charges were not true. The fifth and sixth accused are the two co-respondents, defendant's brother's widow and a young woman who lived, with her husband their children near defendant's mother's house in Betterton.

Defendant visited the widow in Pennsylvania after plaintiff and defendant had separated. The widow visited the other co-respondent and spent the night at her home in Betterton on July 3, 1945. Defendant says the widow spent that night, from about 3 o'clock in the morning, at plaintiff's farm. The widow says that before and since her husband's death she consulted plaintiff several times a year about her husband's farm; on the afternoon of September 19, 1945 she went to plaintiff's farm to ask plaintiff to haul her furniture by truck from her farm to her home in Pennsylvania. Defendant happened to be at the farm at the time. Defendant says plaintiff had been with the other co-respondent all the previous day and with her or some other woman, in his car or walking about the yard at the farm, most of the night; the widow went into the living room where plaintiff was; when defendant got into the room she heard the widow calling him "Darling"; the widow "was sitting on the davenport with her head right down in his face." The widow denies this testimony and says defendant called her some short and ugly names; she struck defendant

in the face with her fist, scratched her face and pulled her hair. Defendant did, or tried to do, likewise. After this fight both defendant and the widow left the farm.

The other co-respondent's oldest child, a boy, is about four years younger than the son of plaintiff and defendant, but the two boys were frequently together at the farm and at the co-respondent's home. For some months her husband was employed in New York and was away from home from Monday till Friday evening. He testified that plaintiff is one of the best friends he ever had; that plaintiff visited his house in his absence with his knowledge and consent and, as they had no car during the war period, plaintiff had his permission to take his wife in plaintiff's car to Chestertown or Betterton or various places that were necessary; in his opinion, his wife is definitely loyal and faithful to him. Defendant once made accusations to him against his wife; he told defendant that if he ever heard her say that again he would have her reported to the authorities. The co-respondent says plaintiff and his son always had dinner with them at week ends, and once or twice during the week, if she had something special, she would ask them in. He was frequently at her house with the boy, sometimes alone, never later than 10 or 11 when her husband was not there. She has gone with him to Chestertown or to the beach in his car. On Saturday nights (when her husband was home) they frequently had "noisy parties" at their home, that lasted till 2 or 3 o'clock.

On at least one occasion defendant watched one of these "parties" from a neighbor's yard. She says she saw plaintiff in the kitchen when half a dozen persons, including the husband, were in the room, put his arm around the co-respondent and kiss her and heard her ask him if he didn't want to go upstairs; there is some obscurity as to whether this story covers one or more episodes and how much is said to have occurred while the husband was present.

Without going into details, defendant's charges against both the widow, the other co-respondent and the four previous women are wholly uncorroborated and are generally and specifically contradicted by testimony of plaintiff, the son, the two co-respondents, the husband of the one, three of the other women and the husband of one of them. With the exception of defendant's story, there is no evidence of inclination and opportunity for adultery, unless we hold that an automobile *per se* is evidence of both.

Concerning plaintiff's bill for divorce the lower court says: "Now as to the original bill of the husband against the wife. Here again the proof of desertion by the wife of the husband is not too convincing, although it is, perhaps, sufficiently satisfactory to warrant the court in granting a decree of divorce had his conduct been exemplary, which it certainly was not. Quite the contrary. The desertion of him by his wife gave him no license to conduct himself as if he were an unmarried man. And his actions, to say the least, were not those of an injured and unoffending spouse. There is a well known maxim of equity that 'he who comes into equity must come with clean hands.' The effect of the maxim is that a court of equity will leave guilty parties seeking its aid where it finds them. 30 C. J. S., Equity, sec. 99, page 494. 'Unclean hands' within the meaning of the maxim of equity, is figurative description of a class of suitors to whom a court of equity as a court of conscience will not even listen, because the conduct of such suitors is itself unconscionable.' * * *. *Vulcan Detinning Company v. American Can Company,* 72 N. J. Eq. 387, 67 A. 339, 341, 12 L. R. A., N. S., 102. In *Piper v. Piper,* 176 A. 345, at page 349, 13 N. J. Misc. 68, the Court of Chancery of New Jersey said: '* * * whenever a suitor who, as instigator of an action seeking some remedy, has willfully violated conscience, good faith or other equitable principle in his prior conduct relating to the same transaction, then he will be repelled from the forum whose foundation is good conscience.' Upon full

consideration of all the testimony in this case this court must hold that the complainant willfully violated conscience and good faith by his conduct pending the filing of his suit for divorce. For this reason the original bill of complaint must also be dismissed. The court is of the further opinion that where parties to divorce proceedings place themselves in such situations as the evidence in this case discloses it should leave them where it found them, and grant no relief to either party."

We concur in the view that the proof of desertion by the wife is sufficiently satisfactory to warrant a divorce. We cannot concur in dismissing the bill. We may assume, without deciding, that a man's attentions to a woman (though not criminal) may be so marked as to justify his wife in leaving him and thus may amount to constructive desertion by him. *Cf. Schilbach v. Schilbach,* 138 Md. 56, 59, 113 A. 576. But after a man has been deserted by his wife, beginning such associations with other women cannot be regarded as a marital offense.

The defense of recrimination can be sustained only by proof of a marital offense which would constitute ground for divorce. We may assume, however, that the equitable doctrine of "clean hands" is applicable in a divorce court and is not restricted to the defense of recrimination. But "equity does not demand that its suitors shall have led blameless lives." *Loughran v. Loughran,* 292 U. S. 216, 229, 54 S. Ct. 684, 689, 78 L. Ed. 1219. This court has repeatedly held (and now holds) that divorces should not be granted for light or trivial causes; but few opinions in divorce cases indicate that the conduct of either of the parties has been exemplary.

The lower court does not specify what particular conduct should bar relief to plaintiff, but we may assume that plaintiff's association with the married co-respondent was "grossly imprudent." A more Victorian aloofness on her part might have spared her from becoming involved in this case. However, the lower court does not find evidence of guilt in this imprudent conduct; nor do we. Not every one may understand how a man near

fifty can enjoy weekly "noisy parties," with younger people, lasting till 2 or 3 o'clock in the morning. Tastes and endurance differ. If plaintiff was able to find "innocent merriment" in this way, he is not on that account to be outlawed in a divorce court or a court of equity. The same is true of his more quiet but more imprudent conduct. The law does not impose or enforce canons of taste in domestic discord. *Blenard v. Blenard,* 185 Md. 548, 560, 45 A. 2d 335.

> *Decree affirmed in part and reversed in part and cause remanded for passage of a decree pursuant to this opinion, appellant to pay the costs.*