## THOMAS *v.* THOMAS

[No. 64, October Term, 1950.]

*Decided January 10, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

· *William J. McWilliams* for the appellant.

*C. Osborne Duvall* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing, after hearing in open court, an amended bill for divorce on the ground of abandonment. The parties were married on October 2, 1939. In the original bill, filed April 5, 1948, plaintiff alleged, under oath, that he had resided in Washington with his wife "until on or about the 11th day of February, 1944, except for two intervals of separation", and that "on or about the 11th day of February, 1944, the parties * * * voluntarily separated and have voluntarily lived separate and apart without any cohabitation for three consecutive years." Defendant in her answer denied the allegation of voluntary separation. On February 2, 1950, plaintiff, by his counsel, filed a petition alleging that "within the past few months certain information has come to the attention of the plaintiff, which the plaintiff believes will establish the fact that said separation was not voluntary but that the defendant did in fact desert the plaintiff" and asked leave (which was granted) to amend his bill so as to charge desertion. The amended bill, filed the same day, charges desertion "Since February, 1944." The case was heard on April 21, 1950, and an opinion and the decree were filed on May 4, 1950.

The parties are in their forties. Neither had been married before. There were no children. She is a Roman Catholic, he is not. She was, and still is, a civil service employee in Washington. Her salary is now about $3,900. He was employed as a real estate salesman in Washington. A few months after the marriage he went into the real estate business there for himself. At first the business was not successful. Later, he says, it was. From the time of the marriage until February 11, 1944, with at least four "intervals of separation" when he left and stayed away, they lived

together at her house in Washington. On February 11, 1944, he says, he left her house never to return. She says, he denies, that one night in November, 1946, he returned, discussed a reconciliation, had marital relations with her and left the same night. With this possible exception they have not lived together since February 11, 1944. In the later part of 1943 he bought a waterfront property in Anne Arundel County at Shady Side, about thirty-five miles from Washington. The former owners had lived there the year round. Plaintiff says the house was still fit for such occupancy. Defendant says it could not be heated for winter until plaintiff later made improvements. They never lived together there. In the summer of 1944 he lent the Shady Side house to her and some friends for a week-end; he was there at the time. He says when he finally left in February, 1944 he was willing for her to come down to Shady Side to live with him. "I discussed it with her on several occasions, and she said until I was able to put her up in something better than she had there she wouldn't give it any consideration". The last time defendant was at Shady Side in 1945, he says he told her he had "a peace warrant out" (though in fact he had not) and if she came down there again he would have her arrested. "So I just told her to keep away, and she has never been back since. Apparently she believed me."

He first left her about six months after the marriage. He came in about 8 o'clock in the morning, after an all night card party. She asked him to leave and he left. A few days later he returned. She said she would never ask him to leave again. "She never did ask me to leave any more. Over a period of two or three years I left her five times. Every time I got fed up with it more and more, week in and week out, and finally it just got to a point where I had to leave." He says he thinks he lived with her "all told for perhaps a year." He says she was domineering, always reminded him of her ownership of the house and her salary, constantly nagged him, rifled his desk by day and his pockets by night, refused

to sign mortgages and other business papers without exacting money from him, embarrassed him and even injured his credit among friends and business acquaintances. Apparently he kept a bag packed to leave at any moment. After she ordered him out he says he kept a room at a Washington hotel for three and a half years. Evidently he left so often that he has no definite recollection of the individual occasions, or even the exact number of them, except his generalization that he "got fed up" and could stand it no longer. She tells a different story, that he repeatedly left for no reason at all. It is unnecessary to review their testimony. Her story is no less plausible than his. Neither is corroborated. The judge, who saw and heard the witnesses, held that he had failed to sustain the burden of proof of desertion. We cannot say that the judge was wrong. On paper (without seeing or hearing the witnesses) we do not see how he could avoid holding that plaintiff had failed to prove that defendant deserted him when (or after) he left her for at least the fifth time on February 11, 1944.

Counsel says the judge was prejudiced by "smear testimony". The wife testified that in April, 1942, just after her husband had left her without a word, when she was looking for cigarettes in his suitcase (which he got later, while she was at work), she found a box of contraceptives, which was offered in evidence. She said they had never used contraceptives. He did not deny or explain this testimony; she was not cross-examined about it. A neighbor, testifying for her (before she testified) was asked whether, and if so where, she had seen contraceptives in the Thomas house. On plaintiff's objection the question was excluded. Counsel says this testimony of the wife is too palpably incredible to call for denial. The judge did not, and on paper alone we cannot, so summarily dispose of it. If it were not true, plaintiff could at least have said so.

A friend of the wife, a subordinate in Government employment, testified that in the spring of 1943 plaintiff

telephoned her and asked her to go to the races, she asked whether his wife was going and, when told not, declined to go with him, and that later the same day she saw him in his car with a girl in a naval uniform sitting beside him.

One Sunday in the summer of 1945 the wife, with the same friend and other friends, went to Shady Side and found plaintiff playing cards with a neighbor, an elderly man, and a young woman "scantily attired" in "shorts and a halter", whom he introduced by name. Upstairs the young woman's clothes (some of which she later put on) were found in plaintiff's bedroom, where defendant also found a photograph of a blonde, which was offered in evidence. She says plaintiff said the blonde had been his housekeeper. Plaintiff says the young woman at the house was the last of a week-end house party of six or eight, that he was to drive her to town and later did so, and that when he had a house party the upstairs rooms were assigned to the women and the men slept downstairs and dressed and undressed in the bathhouse.

About a month later, on a Sunday evening, defendant and some friends went to Shady Side and found no one in the house except a young woman on a bed, nude, asleep and drunk. Plaintiff says he had lent the house to friends for the week-end for a house party and he was not there. He does not know who the nude was.

A witness testified that plaintiff told her he had a blonde housekeeper and had taken her to New York because he thought she had possibilities as a model. Plaintiff testified that if he ever referred to her as his housekeeper he did so facetiously; she never kept house for him. In 1945 he had a rooming house in Washington. The blonde had a room there. He says that in the spring of 1945 she and another girl employed by the Navy Department had a sixty day period in which they had to wait before they could be re-employed in another job; he let them go down to his house at Shady Side, to clean and fix it up and live free of

charge; they stayed for the sixty days and then left. While they were there he took the blonde to New York. She had recommendations to the Powers Model Agency. He was going to New York on business and agreed to take her with him. He got hotel reservations, two rooms, at one hotel, but she through a friend got reservations at another, where they spend the first night; they spent the next night at the other hotel. On the train he introduced her to a "very fine man", who took her out at night and some months later married her. About a week after she went to New York with plaintiff she came back to Shady Side, got her clothes and went back to New York to work.

Regarding what counsel calls "smear testimony", Judge Michaelson says in his opinion: "When the overall picture presented by the evidence in this case is taken into consideration, the court cannot ignore certain component parts thereof, to wit: the presence of * * * the so-called blonde housekeeper, at the cottage, the contraceptives found in the travelling bag of the plaintiff, the statement by the defendant that she and her husband never used them, the nude woman on the porch, her pair of red slacks and an over-night bag, the statement by the plaintiff that he wasn't serious when he said he was going to have his wife bound to keep the peace, the girl in the naval uniform in Mr. Thomas' car, his hiring detectives to follow the movements of Mrs. Thomas.

"The least that can be said about some of these details is that they indicate amorous inclinations of the plaintiff directed towards probable recipients other than the defendant. The picture is somewhat inconsistent with the actions of one who is professing to be serious in his desires and hopes of effecting a reconciliation."

Counsel says, (1) this evidence does not prove adultery, (2) if it did, the adultery was condoned (which could only be true of the first incident, unless the wife's testimony as to cohabitation in 1946 is accepted), and (3) therefore it proves nothing. If we assume the first two

contentions, the third does not follow. We may assume that the fact that a married man of mature years (if not mature temperament) took a young blonde beauty, his "roomer" and quasi-housekeeper, to New York, where they registered under their own names and had separate rooms, does not prove adultery—even if she had not immediately met and eventually married a "very fine man". But we cannot say that in the circumstances the man's wife owed a duty to seek him out and resume cohabitation. Attentions to other women, short of proof of adultery, may sometimes justify a wife in leaving, or not returning to, her husband. *Schilbach v. Schilbach,* 138 Md. 56, 59, 113 A. 576; *Meeks v. Meeks,* 189 Md. 80, 87, 54 A. 2d 334. The so-called "smear testimony" is not without legitimate weight as indicating what kind of people the husband, his friends and (if his testimony is believed) his friends' friends were.

The husband's contention that his wife deserted him by refusing to follow him to a new matrimonial domicile might present a question of law if it were based on facts. The right to select the matrimonial domicile ordinarily seems to be the sole or principal remnant of the husband's dominant status in the common law unity of husband and wife. But even this right was the correlative of the husband's duty as worker and provider for the matrimonial unit. When the wife is an equal co-worker and provider, a different question would be presented if she were asked to move thirty-five miles from the workplace of both. We need not consider that question, as it does not arise on the facts. This husband did not move the matrimonial domicile; he simply left, for at least the fifth time.

The only tangible evidence of effort toward reconciliation (other than the wife's testimony as to cohabitation in 1946) relates to the visit of the wife and her friends to Shady Side in 1945, when they met the week-end guest and the wife found the blonde's photograph. The husband says he then asked his wife to come there and live with him, she wanted time to consider and was to

telephone him the next day but did not do so, he called her, she began to make conditions (which he does not remember, but which were "not bad") and he concluded that she was trifling. She says he was to call her, but did not, she called him, he said he was busy and would call back but never did. At the hearing she testified that she was still prepared to take him back, "if he were willing to make an effort, to be the man that I thought I married." It is true, as counsel says, that this is not an unconditional offer, but this condition is virtually implied in every marriage. We recognize, however, that offers and refusals of reconciliation· from the witness stand carry little weight. *Hornstein v. Hornstein,* 195 Md. 627, 638, 75 A. 2d 103, 108.

We have gone into too much detail about this routine case. As in so many of the divorce cases that reach us, the parties have made practically no effort to preserve a marriage which has become an increasingly irksome yoke to both. The short answer to all plaintiff's contentions is that the case is governed by the rule that divorces should not be granted for light and trivial causes and the rule, of broader application, that the decision on facts of a judge who has seen and heard the witnesses should not be reversed unless clearly wrong.

*Decree affirmed, with costs.*