## MANOR REAL ESTATE COMPANY v. THE JOS. M. ZAMOISKI CO.

[No. 344, September Term, 1967.]

*Decided October 11, 1968.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, MCWILLIAMS, FINAN, SINGLEY, and SMITH. JJ.

*George W. Constable,* with whom was *Caesar L. Aiello* on the brief, for appellant.

*John J. Ghingher, Jr.,* with whom were *Weinberg & Green* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

Appellant (Manor) agreed to sell appellee (Zamoiski) a 6 acre site in its industrial park in Prince George's County for $135,000. The contract called for Manor to convey to Zamoiski

a fee simple title "clear of all liens and encumbrances." Zamoiski contends that the unpaid benefit charge ($10,130.76) of the Washington Suburban Sanitary Commission (WSSC) for sewer and water facilities is such an encumbrance. In the circumstances we must agree with Zamoiski.

Negotiations between Manor, a subsidiary of the Pennsylvania Railroad, and Zamoiski began some time prior to October 1964 and continued for more than a year. The first draft of the contract of sale was prepared by Manor. The next draft was prepared by Zamoiski's attorney. Then Manor submitted another draft which was followed by still another Zamoiski draft. There were also many minor revisions agreed upon before the execution of the final draft on 2 November 1965. The parties concede that the final contract was the result of "hard negotiations."

The portions of the long and elaborate contract which have become our special concern are as follows:

"4. At the closing, Grantor shall * * * execute and deliver to Grantee a deed * * * which shall convey * * * a good and marketable title, with covenants of special warranty, *clear of all liens and encumbrances,* * * *."

* * *

"[6.] b. Closing of this transaction shall take place at Grantee's Title Insurer's office on a mutually agreeable date on or before December 31, 1965. The Grantor shall pay for federal documentary stamps and the Grantee shall pay for state and county stamps and transfer taxes on the deed; *real property taxes for the year of transfer shall be apportioned.* Upon failure of Grantee to close within the time limit fixed above, Grantor may elect to rescind this contract and retain the sums paid on account of the purchase price and Grantee shall thereafter have no lien against or interest in the premises, it being understood and agreed that in such event Grantor shall not seek specific performance."

* * *

"9. In the event * * * it should develop that Grant-

or's title to said premises for any reason is *not good and marketable, clear of all liens and encumbrances,* * * * and Grantee shall not be agreeable to accepting title of such lesser quality as the Grantor is willing to give, then the sum paid on account will be refunded to Grantee, who hereby agrees to accept same, whereupon this writing shall be cancelled and neither party hereto shall have any claim against the other by reason hereof.

"10. All understandings and agreements heretofore had between the parties hereto are merged into this contract, which alone fully and completely expresses their agreement, *and the same is entered into after full investigation, neither party relying on any statement or representation, not embodied in this contract, made by the other."* (Emphases added.)

At or about the time set for the closing, 7 March 1966, Zamoiski, for the first time, it says, learned of the charge levied by the WSSC. Upon Manor's refusal to permit Zamoiski to deduct from the purchase price the unpaid balance due on the charge the closing was adjourned. On 16 June 1966 the parties executed an amendment to the contract of sale, the relevant parts of which we have set forth below:

"Grantor and Grantee are unable to agree which of the parties hereto is obligated to pay and discharge current and *future front foot benefit assessments* [charge] of * * * [WSSC] for water, drainage and sanitary sewer facilities constructed in Ardwick Road and Adams Avenue.

* * *

"2. For the purposes of such closing, the front foot benefit assessment of * * * [WSSC] for the current fiscal period will be apportioned between the parties as of the date of closing.

"3. After the date of closing, the Grantee shall have the right to assert a single claim and/or suit in an amount which shall not exceed * * * $10,130.76, plus interest, to resolve the dispute between the parties over payment of current and future front foot benefit assess-

ments of * * * [WSSC] for presently constructed water and sewer facilities, which right shall not merge with but shall survive the delivery of the deed from Grantor to Grantee at closing.

"4. Any final adjudication by a court of competent jurisdiction from which adjudication the time for appeal shall have expired, shall be conclusive and binding on the parties hereto with respect to the liability of the Grantor and Grantee for the payment of said * * * $10,130.76, plus interest, which is the entire amount in controversy, notwithstanding the fact that only paid and/or then current assessments of * * * [WSSC] may be the subject matter of said suit and adjudication, since it is the intention of the parties to avoid a multiplicity of suits in this matter.

* * *

"6. This agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors and assigns." (Emphasis added.)

The closing took place on 24 June 1966. On 19 July 1966, Zamoiski filed suit. The trial judge, Carter, J., on 13 October 1967, holding that "the removal of all charges for the existing utility benefits involved here is the obligation of * * * [Manor]," entered a judgment in favor of Zamoiski against Manor for $10,163.76, with interest from 16 June 1966 (the date of the amendment).

Manor insists that its obligation to deliver a title "clear of all liens" applies only to *existing* liens and not to "future potential liens." It argues that because the WSSC benefit charge, like county taxes, is collected annually, and, "for purposes of collection * * * [is] treated as County Taxes,"[1] it does not

---

1. "Said front foot benefit charge from and after January 1st, 1927, shall for all purposes of collection be treated as County Taxes, shall bear the same interest, the same penalties and advertise in the same manner as and with County Taxes, and all property subject to said front foot benefit charges shall be sold for the same at the same time and in the same manner as said properties are sold for County Taxes, and all of the law relating to the collection of County Taxes so far as the same is applicable shall relate to

become a lien until the year in which it is collectible. In support of its argument Manor relies upon the statute. (Quoted in n.1.) Judge Carter, however, observed, in his opinion, that treating the charges as taxes to expedite their collection does not make them taxes, any more than a mule does not become a horse just because it "may be ridden like a horse." Manor further declares that "if the future charges are encumbrances, it is only because they are first liens," which seems to us to be another way of saying that unless an encumbrance is also a lien it cannot be an encumbrance. But there are many encumbrances, such as easements, that are not liens. As Judge Carter put it "a lien is always an encumbrance, but an encumbrance need not necessarily be a lien."

For a discussion of the significance of the words "lien," "lienor," "encumbrance" and "encumbrancer", in a context different from the case at bar, see *Automobile Acceptance Corp. v. Universal C. I. T. Credit Corp.*, 216 Md. 344, 139 A. 2d 683 (1958).

We discussed, at some length, the nature of the benefit charges levied by WSSC in *Morris v. Ehlers,* 211 Md. 23, 124 A. 2d 776 (1956), where the principal question presented is somewhat akin to the one now under consideration. There the buyer contended the benefit charges constituted liens against the property for the full 40 year period. While we chose not to resolve that issue, the language of Chief Judge Brune, who spoke for the Court, is interesting:

> "As one ground of defense the appellees rely upon the fact that the amount of the asserted assessment could not have been paid off by them in a lump sum at the time of their transfer of the property. They also rely, perhaps more heavily, upon testimony that a custom exists in Montgomery County under which only annual current instalments of front foot benefit

the collection of the front foot benefit charge. No property redeemed from a County Tax sale, and no property sold by the County Commissioners after a final tax sale shall be redeemed or sold except upon the payment of the front foot benefit charge due thereon." Prince George's County Code § 83-72 (c) (1963).

charges made by the Commission are adjusted to the date of transfer and under which no allowance is made for the unpaid portion of the original assessment.

"Each of the assessments here involved is stated to be payable over a period of forty years. The purpose of this is to conform more or less with the period for which bonds issued to finance the improvements are to run. The earliest of the charges here involved ran for forty years from January 1, 1948, the second from January 1, 1949, and the third from January 1, 1951.

"The testimony of an official of the Commission showed that the appellees could not have paid off the balance of these assessments at the time of the settlement. They could have done so within one year after the original determination or the date of actual imposition of each of the several amounts chargeable against this property (there being some doubt as to which), but on either basis the time had passed. The privilege of prepayment of the unpaid balance is allowed as to certain other classifications of property after the first year, but there is no such provision with regard to 'Small Acreage' property. A reclassification of this particular tract to one of these other classifications would make it possible to pay off the entire amount, *but that seems immaterial for present purposes.* Cf. *District Title Co. v. United States,* 169 F. 2d 308, 83 App. D. C. 335.

"If the aggregate benefit charges made by the Commission against the appellees' thirty-two acre tract constituted assessments, *we are unable to see how the fact (if it be one) that, after the first year, they could not be paid off by way of anticipation of future instalments made them any the less assessments.* It is true that under the practice of the Commission shown by the testimony, the sellers could not have paid these assessments at the time of transfer. There was nothing, however, to prevent their complying with the other alternative, which was to make an allowance for them.

> "The facts that no assessment of the 26.546 acres purchased by the appellant was ever made in his name and that he himself never paid any front foot benefit charges based thereon seem to us wholly immaterial insofar as the existence of an assessment against the land is concerned.
>
> *"Whether these charges constituted liens against the property for the full amount thereof from the dates when they became final under the statute, or whether they constituted liens only as and when annual charges were entered by the Commission's agents on the books of the County Treasurer, is a question which we are not called upon to decide in this case."* Id. at 27-28. (Emphasis added.)

In the case at bar, it should be noted, the "benefit charge may be extinguished or redeemed, *at any time,* upon payment"[2] of a determinable amount which, the parties here have agreed, was, at the time, $10,130.76.

The decision in *Morris v. Ehlers, supra,* was based entirely on the language of the contract, the pertinent paragraph of which was as follows:

> " '9. Taxes, general and special, are to be adjusted according to the certificate of taxes issued by the Treasurer of the County, *except that assessments for improvements completed prior to the date hereof, whether assessments therefore [sic] has been levied or not,* shall be paid by the Sellers or allowance made therefore [sic] at the time of transfer.' " *Id.* at 25. (Emphasis added.)

Chief Judge Brune's comment in this regard is also interesting:

> "Our view with regard to the interpretation of the contract is reinforced by one other document which is included in the record. That is the proposed contract of March 15, 1954, which the appellant signed,

---

2. Prince George's County Code, § 83-71 (f) (1963).

but .which the appellees declined to accept. That proposed contract was on a printed form, from which we may infer that it is in rather general use. One paragraph contains a sentence which is virtually identical with the first sentence of Paragraph 9 of the executed contract. The proposed form contains a succeeding sentence which reads as follows: 'If the property is serviced by the Washington Suburban Sanitary Commission, annual benefit charges of said Commission are to be adjusted to the date of transfer and assumed thereafter by purchaser.' There is no corresponding provision in the executed contract. The learned trial judge took its absence as an indication of fraud or of something very close to it. So far, however, as the record discloses, the appellees did not set up fraud as a defense, and they went through with the contract with full knowledge of the plaintiff's contention and counsel for the respective parties entered into a stipulation that $3,500 should be held out of the sale price of the property and retained by the title insurance company pending determination of litigation to settle the question, which the seller was to institute promptly in the Circuit Court for Montgomery County. This case was instituted pursuant to that stipulation. The stipulation was without prejudice to rights of either party. *It is also true that both parties had the advice of their own counsel before executing the contract, which was in typewritten form. The contract itself bears evidence of having been carefully studied before being executed. Changes made on the first page were carefully initialed apparently by the sellers and by the purchaser's counsel, and the same is true of an entire clause on the second page, which was eliminated.* The signatures of the sellers are witnessed by their counsel. We do not think that the record evidence sustains the trial judge's characterization of this change in the form of the contract. The fact that it was made does, however, point up a material difference between the contract as executed in June and as

proposed in March. If it had been finally adopted in the earlier form, it would have been in accord with the custom which the defendants' witnesses said prevailed in Montgomery County.

"We hold that under the terms of the contract the sellers are required to make an allowance for the unpaid front foot benefit assessment made by the Commission for improvements completed before the execution of the contract." *Id.* at 29-31. (Emphasis added.)

It ought to be noted that Manor has been developing its industrial park and selling lots therein since 1957. It is familiar with the work of WSSC and its front foot benefit charges. The property is described in the contract of sale by reference to a plat, dated 28 July 1965, which shows water and sewer pipes in place in the adjoining streets. The contract indicates the property is subject to an easement granted in 1941 to WSSC for water lines. There is also a reference to engineering datum of WSSC. On the other hand this purchase appears to have been Zamoiski's first venture into the area. Moreover we have little doubt that the same printed form mentioned by Judge Brune has been in general use in Prince George's County for some time and that it was in general use during the negotiations leading up to the contract of sale under consideration and, it should be observed, Robert K. Williams, Esq., whose practice consists primarily of real estate title work in Prince George's County, testified it was customary to adjust the benefit charges between buyer and seller to the date of closing "just like real estate taxes."

In these circumstances, it seems very odd indeed that Manor would have covenanted to deliver a title "clear of all liens and encumbrances," and, at the same time, limit the apportionment of public charges to "real property taxes for the year of transfer" if it intended, as it now claims, to pass on to Zamoiski the burden of paying the remainder of the WSSC benefit charge.

We see no more reason here than we did in *Morris v. Ehlers, supra,* to decide whether the $10,130.76 benefit charge is a lien because, in our judgment, it is an encumbrance even if it is not a lien. It has been said that the mere fact that property be-

comes liable for the payment of a benefit charge for municipal improvements may constitute an encumbrance even before the amount thereof has been ascertained. 4 H. Tiffany, *The Law of Real Property* § 1003, n. 3 at 135 (3d ed. 1939). It has been said also that present liability to an eventual lien may be sufficient to establish an encumbrance. 20 Am. Jur. 2d, *Covenants* § 87 (1965). Both parties have cited a number of cases [3] in support of their respective positions but we have not found them to be helpful either because of the dissimilarity of the factual situations or because of the tendency of the courts to equate or confuse liens with encumbrances.

That the benefit charge of WSSC is an encumbrance upon property served by its facilities seems to us to be a proposition which requires by way of proof nothing more than serious reflection upon the purpose for which WSSC was established, how it goes about accomplishing that purpose and the statutes authorizing and directing it to do what it does. Stated simply the business of WSSC is to construct (or acquire) water mains and sewers which the Legislature has "declared to be a benefit to all property abutting the same." [4] The funds required for the construction (or acquisition) are provided by the sale of bonds.[5] To raise the money to retire the bonds WSSC "is empowered and directed to *fix and levy a benefit* charge upon all abutting property." [6] (Emphasis added.) The benefit charge is to "be paid annually, beginning from the time of the levy thereof, by all *properties* * * *, for a period of years coextensive with the period of maturity of the bonds out of the proceeds of which such construction [or acquisition] was done." [7] (Emphasis added.)

A significant feature of the benefit charge, as earlier noted, is that it "may be extinguished or redeemed, at any time" and

---

3. *Magruder v. Supplee,* 316 U. S. 394 (1942); *District Title Ins. Co. v. United States,* 169 F. 2d 308 (D. C. Cir. 1948); *Baker v. Smith & Gottlieb, Inc.,* 132 F. 2d 18 (D. C. Cir. 1942); *Ahrens v. Broyhill,* 117 A. 2d 452 (D. C. Mun. App. 1955); *Union Realty Co., Inc. v. Ahern,* 93 A. 2d 84 (D. C. Mun. App. 1952).

4. Prince George's County Code § 83-71 (a) (1963).

5. *Id.* § 83-63.

6. *Id.* § 83-71 (a).

7. *Id.* § 83-71 (f).

upon such redemption or extinguishment WSSC is required to use the amount paid to "purchase and cancel one or more" [8] of the bonds. Also having significance is the requirement that "the benefit charge shall be paid and extinguished," in full, whenever property subject to it is acquired for public use by "the State, county or any municipal corporation, commission, board, or * * * [other agency]." [9]

Manor insists that the benefit charge is in reality a tax. As earlier noted, it points to the statute [10] requiring that, for purposes of collection, the benefit charge shall be treated as County Taxes. But there are important differences between real estate taxes and WSSC benefit charges. Taxes are levied annually; the benefit charge is levied but once. Taxes change as to amount depending on changes in the tax rate and fluctuations in the assessed value of the property; the annual instalments of the benefit charge remain constant. Taxes continue indefinitely; the annual instalments of the benefit charge cease when the bonds are retired. Taxes cannot be "redeemed or extinguished" by the payment of a determinable amount; the benefit charge can be so redeemed or extinguished. Taxes, except special taxes, become a part of the county's general fund; the benefit charge can be used only to amortize and service the bond issue. And however unlikely it may seem to us now, it is possible that new sources of revenue may, at some future time, result in the elimination of the tax on real estate; the benefit charge must continue inexorably to its predetermined expiration.

Manor makes much of the following provision:

> "The extinguishment or redemption of any benefit charge shall be conditional until the last year of maturity of the bonds from the proceeds of which the construction was done, and if following redemption or extinguishment the use of the property changes to another class so that the property would be placed in a different class yielding a greater annual benefit charge than that utilized for computing the redemption

8. Prince George's County Code § 83-71 (f).
9. *Id.* § 83-73.
10. Quoted in n. 1.

amount, the Commission may reclassify the property and re-impose a benefit charge for the remaining number of years, calculating the benefit charge, however, so as to give credit for the sum paid for extinguishment or redemption." [11]

It seems clear to us, however, that any change in use is a matter entirely within the control of the property owner and that the main purpose of the provision quoted above is to achieve fundamental fairness. Otherwise it would be possible for an owner against whose property there has been levied a smaller benefit charge to redeem or extinguish the charge and then change its use to one calling for a greater charge. We do not think this changes the nature of the benefit charge.

*Cotting v. Commonwealth*, 205 Mass. 523, 91 N. E. 900 (1910), (not cited in either brief) provides us with a set of facts much like the facts in the instant case. In January 1899 the Commonwealth agreed to sell to Cotting a parcel of land in South Boston. In November 1899, the city of Boston ordered the construction of a main sewer in a street abutting the parcel to be conveyed. In November 1901 the parcel was conveyed by the Commonwealth to Cotting. The deed contained a covenant that the land was free from encumbrances. In December 1902 the city levied an assessment for the construction of the sewer which Cotting was obliged to pay. Holding that Cotting was entitled to an adjudication against the Commonwealth for the stipulated amount, Chief Justice Knowlton, for the court, said:

"The next questions are whether the liability to assessment for a sewer, the construction of which had been ordered previously, is a breach of the covenant of freedom from incumbrances in a deed, and whether the failure to protect the grantee from an assessment afterwards made upon the land, to pay the cost of construction of such a sewer, is a breach of the covenant of warranty. It is plain under our decisions that, if the grantor had been an individual owner whose land was liable to assessment, *such an assessment would*

---

11. Prince George's County Code § 83-71 (f).

*be an incumbrance, even though the construction of the sewer and the assessment for it were not until afterwards. Carr v. Dooley,* 119 Mass. 294. See also *Hutchins v. Moody,* 30 Vt. 655; 34 Vt. 433; *Peters v. Myers,* 22 Wis. 602. We may assume that, under our decisions, no assessment could be enforced against the Commonwealth so long as it held the title. *Corcoran v. Boston,* 185 Mass. 325; 193 Mass. 586. *Worcester County v. Worcester,* 116 Mass. 193, 194. *Boston v. Boston & Albany Railroad,* 170 Mass. 95. But this would not invalidate an assessment made for construction completed after the title had passed to a private person. The condition when the plaintiffs took their deeds was that this land was subject to an assessment as soon as it came into the plaintiffs' hands, under an order for a sewer which had been passed previously. *There was a liability which was sure to become absolute and enforceable against the land as soon as the work was completed and the expense ascertained. This was an incumbrance from which the plaintiffs were entitled to be protected under the covenant."* *Id.* at 526-27. (Emphasis added.)

Manor devoted much of its brief and a good deal of its argument to another paragraph of the contract and how it ought to be interpreted. Zamoiski, in opposition, did likewise. In view of what we have said, however, further consideration is unnecessary. The judgment of the trial court will be affirmed.

> *Judgment affirmed.*
> *Costs to be paid by the appellant.*