CARL STRASS ET AL. *v.* DISTRICT-REALTY
TITLE INSURANCE CORPORATION

[No. 740, September Term, 1975.]

*Decided June 8, 1976.*

The cause was argued before MOYLAN, POWERS and LOWE,
JJ.

*Morton Rosenberg* for appellants.

*Arthur C. Elgin, Jr.,* with whom were *Thomas Penfield
Jackson* and *Jackson, Parkinson & Jackson* on the brief, for
appellee.

Powers, J., delivered the opinion of the Court.

The controversy involved in this appeal is whether assessments levied by the City of Rockville against nine residential lots for benefits resulting from installation of water and sewer lines by the City, were liens or encumbrances insured against by policies of title insurance purchased at the time of settlement by the owners of each of the lots. The claims of the respective lot owners were asserted in their Third Amended Declaration filed in the Circuit Court for Montgomery County against District-Realty Title Insurance Corporation. The plaintiffs were nine [1] married couples. They were: Carl Strass and Elaine W. Strass, Morton Rosenberg and Aileen Rosenberg, Jon Ranhand and Barbara O. Ranhand, Richard J. Zack and Mary T. Zack, James K. Jackson and Carol Jackson, Robert R. Hench and Marilyn Hench, Carl D. Olson and Rena Olson, Gabor F. Dobay and Norma Lee G. Dobay, Robert E. Gant and Janet Gant.

The title insurance company was the only defendant proceeded against in the Third Amended Declaration. The plaintiffs alleged that each of the couples, between 4 September 1970 and 25 June 1971, had settled with the builder and seller on a contract for the purchase of a house and lot in the Rockshire Subdivision in the City of Rockville, Montgomery County. Each of the couples obtained, at the time of settlement, a title insurance policy issued by District-Realty Title. The plaintiffs alleged that they thereafter learned that the City of Rockville made an assessment against each of the lots in the aggregate sum of $2,509.58, payable over a 20 year period, and that those assessments constituted liens or encumbrances against which they were protected by the title insurance policy.

The case was brought to issue by several pleas filed by District-Realty Title, including pleas of general issue and special pleas that the assessments did not constitute liens or

---

1. Originally there were ten couples. The suit was later dismissed as to one of the couples.

encumbrances at the time its policies of title insurance were issued.

On 9 June 1975 a hearing was held in the Circuit Court for Montgomery County before Judge John J. Mitchell on a motion for summary judgment filed by the plaintiffs and a cross motion for summary judgment filed by the defendant. Each motion was accompanied by a supporting memorandum of points and authorities, including numerous attachments. In addition, each side filed a memorandum in opposition to the summary judgment motion against it.

Judge Mitchell took the motions under advisement. On 24 June 1975 he filed an order denying the motion of the plaintiffs and granting the motion of the defendant. On the same day, the docket shows the entry of judgment in favor of the defendant for costs.

Thereafter, Judge Mitchell filed a memorandum explaining the grounds for his decision. The plaintiffs, through their attorney,[2] noted a timely appeal.

Each motion for summary judgment was, necessarily, premised upon the moving parties' contention that there was no genuine dispute of any material fact. From our examination of the motions, and the memoranda supporting and opposing them, we find nothing to indicate that any fact material to the decision of the case was disputed by either side.

Among the evidentiary material properly before the trial court, in conformity with Maryland Rule 610, the significant evidence, we believe, was the title insurance policies and the records of official actions taken by the City of Rockville. Matters of law were, of course, also before the court.

The earliest of the title policies here involved was issued

---

2. The attorney who had represented all of the plaintiffs up to that point later filed in the lower court a motion for leave to withdraw, representing to the court that the plaintiffs had advised him of their intention to proceed with the appeal *pro se*. The circuit court granted leave, and the appearance was stricken. The record shows that each of the plaintiffs would prosecute his appeal *pro se*. Only the appellant Morton Rosenberg did so. He filed a brief describing himself as, "Attorney Pro Se and on Behalf of all other Appellants".

on 10 September 1970, and the latest on 28 June 1971. Each policy insured against direct loss or damage by reason of

"1. Any defect or defects in the title of the Insured to the estate or interest covered hereby and identified under Schedule A hereof in the real estate described under said Schedule A; or 2. Liens or encumbrances charging the same, saving and excepting all loss or damage by reason of the defects, estates, interests, objections to title, liens or encumbrances mentioned in Schedule B hereof or excepted by the Conditions and Stipulations of this Policy * * * ."

None of the policies contains a relevant exception in Schedule B. In the Conditions and Stipulations of each it is provided:

"2. The Company shall be liable hereunder in damages only: * * * (2) Where there has been [a final determination in a court of competent jurisdiction] adverse to the title insured upon a lien or encumbrance not excepted in this Policy."

* * *

"8. Nothing contained in this Policy shall be construed as insuring * * * (6) against defects and encumbrances arising after the effective date of this Policy, or created, suffered, assumed or agreed to by the Insured."

The critical action of the City of Rockville was taken in its Ordinance No. 33-71, adopted on 12 October 1971. It cited the completion of the construction of water and sewer lines in several subdivisions, theretofore authorized; it ordained the approval of the work and statements of costs of the several projects; and it ordained that:

"Pursuant to the provisions of Article X, Section 1, Paragraph d of the Charter of the City of

Rockville, Maryland, the expense of the work described in Paragraph 1 above is hereby levied as special assessments against the abutting properties and respective record owners thereof as of July 1, 1971, in the amounts shown on the attached list. The work described above is hereby found and declared to be of special benefit to the properties shown on said list in the amounts assessed."

The list of Special Assessments levied included, among other properties, 131 separate lots in the Rockshire Subdivision, each assessed for $2,509.58. Appellants were identified by name and address as owners of their respective lots.

The issue brought into sharp focus by what we have quoted is whether the assessments levied by the Ordinance of 12 October 1971 constituted liens or encumbrances on the lots of appellants on the effective dates of their title insurance policies. In addition to the Ordinance itself, other facts which it is contended bear on that issue are:

a. The minutes of a meeting of the Mayor and Council of Rockville held on 10 June 1968, containing this entry:

> "Re — Approval — Water & Sewer Assessment Projects — Rockshire Subdivision

"The Mayor and Council received a memorandum from the City Manager, noting receipt of a request, together with the appropriate waiver of public hearing, for the installation of water and sewer, on a special assessment basis, in a large portion of the Rockshire Farms subdivision. It was recommended that the Mayor and Council approve this request.

"On motion of Councilman Hanna, duly seconded and unanimously passed, the Mayor and Council gave its approval to the water and sewer projects."

b. Final passage on 3 November 1969 by the Mayor and Council of Rockville of Ordinance No.

52-69. The Ordinance authorized the issuance of "General Improvement Bonds of 1969" in three series, Series A, Series B, and Series C, in varying amounts, all to be disbursed for financing various municipal improvements, itemized in the Ordinance by project number.[3] The Ordinance prescribed the form of the bonds, the schedule of maturities, and the form of the advertisement of sale. It required the advertisement to contain the following statement:

> "The bonds of each of the series described herein are general obligation bonds of The Mayor and Council of Rockville and will constitute an irrevocable pledge of the full faith and credit and unlimited taxing power of said City. In addition, special annual benefit assessments have been duly authorized with respect to the improvements to be financed by the proceeds of the Series A Bonds, which assessments are dedicated as the primary source of payment of such Series A Bonds. Also, water and sewer connection charges have been duly authorized with respect to the improvements to be financed by the proceeds of the Series C Bonds, which connection charges are dedicated as the primary source of payment of such Series C. Bonds."

Ordinance 52-69 further provides, in Section 12:

> "That, the proceeds of the special benefit assessments with respect to the improvements set forth above to be

---

**3.** While it is not readily apparent from the Ordinance itself, we shall assume that one or more of the projects listed relate to the water and sewer lines in Rockshire.

financed by the proceeds of the Series A Bonds, as and when collected, shall be credited to the appropriate accounts of Rockville for the purpose of providing, to the extent thereof, for the payment of the interest on and principal of the Series A Bonds."

and in Section 14:

"That, for the purpose of paying the principal of and interest on the Bonds authorized to be issued by this Ordinance, Rockville shall levy or cause to be levied, and there is hereby levied, in each and every fiscal year in which any of the Bonds are outstanding *ad valorem* taxes upon all of the legally assessable property within the corporate limits of Rockville in rate and amount sufficient to provide for the payment, when due, of the principal of all of the Bonds maturing in each such fiscal year and of all the interest on the Bonds coming due in each such fiscal year, and, in the event the proceeds from the taxes so levied in each such fiscal year shall prove inadequate for the above purposes, additional taxes shall be levied in the subsequent fiscal year to make up any deficiency. It is the intent of this Ordinance that the rate of said *ad valorem* tax shall be so computed in each fiscal year that the proceeds of such *ad valorem* tax together with (i) in the case of the Series A Bonds, the proceeds of the special benefit assessments applied as set forth in Section 12 hereof, (ii) in the case of the Series C Bonds, the proceeds of the water and sewer connection charges applied as set forth in Section 13 hereof, and (iii) any

other funds lawfully available for the purpose, shall provide sufficient funds to meet said maturing principal and interest on all of the Bonds. Rockville may also apply to the payment of principal and interest of the Bonds any funds received by it from the State of Maryland, the United States of America, any agency or instrumentality thereof, or from any other source, if such funds are granted for the purpose of assisting Rockville in the financing of the public improvements (or type of public improvements) for which such Bonds are issued and may lawfully be applied to such principal and interest payments, and to the extent of any such funds received or receivable in any fiscal year the taxes hereby required to be levied may be reduced proportionately."

c. Final passage on 24 August 1970 by the Mayor and Council of Rockville of Ordinance No. 28-70. This Ordinance authorized the issuance of "General Improvement Bonds of 1970" in two series, Series A, and Series B, in different amounts, to be disbursed for financing various municipal improvements.

It appears that Ordinance No. 28-70, in all respects material to this case, parallels Ordinance No. 52-69, except that it provides additional money for financing additional municipal improvements, some of which may have involved the water and sewer lines in Rockshire.

The City's authority to undertake the improvements and to determine who would ultimately bear the cost [4] was derived from its Charter, which appeared as Chapter 48 of

---

4. The City did not purport to exercise the permissive authority given to municipalities by Code, Art. 43, §§ 409-413.

the then current Montgomery County Code (1965).[5] In what was then Article X. Special Assessments, Sec. 48-60 (now Article XI. Sec. 72-68) of the Charter provided, in part:

> "(a) The council is *authorized and empowered* whenever, in its judgment, the public health, safety or comfort requires it, to grade, construct, reconstruct, pave, or otherwise improve any street, sidewalk, alley, curb and gutter and public highway, or parts thereof, at such time and to such extent and of such materials and in such manner as shall be provided by ordinance and to purchase, contract to purchase, lay or contract to lay water mains and trunk and lateral sewers in said city and to *pay the costs of all such work and assess said cost, or any part thereof, against the abutting property* as hereinafter provided in this section." (Emphasis added).

Subsections (b) and (c) provided that certain abutting owners may petition for a public improvement, and for notice and hearing on such a petition. Subsection (g) provided for the waiver of requirements when all of the abutting property affected is represented in the petition, as seems to have been the case with the developer of Rockshire.

Subsection (d) of Section 48-60 provided:

> "(d) If, after the hearing, the council shall be of the opinion that the public health, safety or comfort requires the work or improvement proposed to be done or made, they shall provide by ordinance for the same and *may charge the expense thereof or any part of such expense against the property* which they shall find to be specially benefited thereby according to the lineal frontage of said property; * * * . The council shall also provide in said ordinance the time and terms upon which payment of said assessments for said work and

---

5. Now Chapter 72, Montgomery County Code, 1972.

improvements shall be made by said property owners, the rate of interest, if any, that shall be charged upon deferred payments and shall provide penalties for failure to pay any deferred payment when due. *Assessments so levied* as aforesaid *shall be a lien* upon the property against which they are charged superior to all other liens *from the date of the approval of such assessments* by the council." (Emphasis added).

Authority to borrow money for any proper public purpose, and to issue bonds, to be authorized by ordinance, was contained in Sec. 48-29 (now Sec. 72-37) of the Rockville Charter. It appears that Ordinance No. 52-69 and Ordinance No. 28-70, to which we have referred, were appropriate to exercise the City's borrowing power. Their adequacy to do so is not at issue in this case.

For the first step in the decision of this case, we look to the enabling statute, and to the ordinances by which the authority was exercised. The Charter, Sec. 48-60 (h), says that the assessments levied against property benefited by an improvement shall be a lien upon the property from the date of the approval of the assessments. The first and only record of any levy of assessments by the City was in Ordinance No. 33-71, adopted 12 October 1971.

We hold that the assessments so levied became a lien upon the property of the appellants from 12 October 1971, the date of the approval of such assessments by the council. The lien arose after the effective date of each of the policies. Clearly the policies of title insurance afforded no protection against the assessments *as liens.*

Appellants contend, however, that their properties were at least *encumbered* by the prospective assessments long before the title policies were issued. They rely heavily upon the Court of Appeals decision in *Manor Real Estate v. Zamoiski Co.*, 251 Md. 120, 246 A. 2d 240 (1968), which, they assert, is directly on point and dispositive of this matter.

We have examined the *Manor Real Estate* decision carefully. Its holding is quite narrow, and has no application

to the issue in the case before us. Even the dicta in *Manor Real Estate*, quoted by the appellants as law, would not lead to a decision of the question here. *Manor Real Estate* involved an issue in common with *Morris v. Ehlers*, 211 Md. 23, 124 A. 2d 776 (1956), decided some 12 years earlier. Both cases involved disputes between buyer and seller over liability for front foot benefit assessments levied against abutting property by the Washington Suburban Sanitary Commission for the cost of installation of water and sewer lines.

In both cases the work had been completed and it appears that the assessments had been levied before the dates of the contracts.

Ehlers had contracted to sell Morris a tract of land in Montgomery County, and had agreed in the sales contract that:

> "Taxes, general and special, are to be adjusted according to the certificate of taxes issued by the Treasurer of the County, except that assessments for improvements completed prior to the date hereof, whether assessment therefore [sic] has been levied or not, shall be paid by the Sellers or allowance made therefore [sic] at the time of transfer."

Several years before the contract was signed front foot benefit charges had been determined and levied against parts of the property by the Washington Suburban Sanitary Commission. Morris wanted Ehlers, at settlement, to pay off or make allowance for the entire assessment, which was payable over a period of 40 years.

Chief Judge Brune, speaking for the Court of Appeals, referred to and quoted a part of the statute under which the Sanitary Commission imposed front foot benefit charges. Citing several previous cases decided under the same statute he stated the opinion of the Court "that the aggregate charges for which the Commission has imposed annual front foot benefit charges are assessments." Against a contention

that by custom in Montgomery County only annual current installments of front foot benefit charges made by the Commission were adjusted to the date of transfer, with no allowance made for the unpaid portion of the original assessment, the Court held that such benefit charges were comprehended within the term "assessment for improvements completed", and that the plain meaning of the contract could not be contradicted by evidence of a custom. The Court said, at 28:

> "Whether these charges constituted liens against the property for the full amount thereof from the dates when they became final under the statute, or whether they constituted liens only as and when annual charges were entered by the Commission's agents on the books of the County Treasurer, is a question which we are not called upon to decide in this case."

It is obvious that the holding of the Court in *Morris v. Ehlers* was that the burden of the assessments was upon the seller, not because of their legal effect as a lien or an encumbrance, which the Court found it unnecessary to decide, but because of the terms of the contract expressing the agreement of the parties.

With that background, we turn again to *Manor Real Estate*. In the contract involved there the seller had agreed to convey a parcel of industrial property in Prince George's County, "clear of all liens and encumbrances". By the time set for closing the purchaser learned of an assessment which had been levied against the property by the Washington Suburban Sanitary Commission for front foot benefit charges. The amount yet to be paid was $10,130.76. The seller contended that each installment became a lien only in the year in which it was collectible. There was evidence of a custom to adjust such benefit charges to the date of closing, as is done with real estate taxes.

The Court of Appeals again found it unnecessary to decide

whether the assessments constituted a lien for the full amount. It said, at 129-30:

"We see no more reason here than we did in *Morris v. Ehlers, supra,* to decide whether the $10,130.76 benefit charge is a lien because, in our judgment, it is an encumbrance even if it is not a lien. It has been said that the mere fact that property becomes liable for the payment of a benefit charge for municipal improvements may constitute an encumbrance even before the amount thereof has been ascertained. 4 H. Tiffany, *The Law of Real Property* § 1003, n. 3 at 135 (3d ed. 1939). It has been said also that present liability to an eventual lien may be sufficient to establish an encumbrance. 20 Am. Jur. 2d, *Covenants* § 87 (1965). Both parties have cited a number of cases in support of their respective positions but we have not found them to be helpful either because of the dissimilarity of the factual situations or because of the tendency of the courts to equate or confuse liens with encumbrances.

"That the benefit charge of WSSC is an encumbrance upon property served by its facilities seems to us to be a proposition which requires by way of proof nothing more than serious reflection upon the purpose for which WSSC was established, how it goes about accomplishing that purpose and the statutes authorizing and directing it to do what it does. Stated simply the business of WSSC is to construct (or acquire) water mains and sewers which the Legislature has 'declared to be a benefit to all property abutting the same.' The funds required for the construction (or acquisition) are provided by the sale of bonds. To raise the money to retire the bonds WSSC 'is empowered and directed to *fix and levy a benefit* charge upon all abutting property.' (Emphasis added.) The benefit charge is to 'be paid annually, beginning from the time of the

levy thereof, by all *properties* * * * , for a period of years coextensive with the period of maturity of the bonds out of the proceeds of which such construction [or acquisition] was done.' (Emphasis added.)"

It is equally obvious that the holding of the Court in *Manor Real Estate* was that such an assessment, already levied, was at least an encumbrance, whether or not it was also a lien.

We find it quite significant that the Washington Suburban Sanitary Commission statute not only empowers, but *directs* the Commission to "fix and levy a benefit charge upon all property abutting upon said water main or sewer". It may be that the statute *directs* the Commission to levy the benefit charge, because the Commission does not possess general taxing power. In any event, such a statutory direction may well be said to create, once the work is done, a "present liability to an eventual lien [which] may be sufficient to establish an encumbrance."

The statutory authority of the City of Rockville, unlike that of the Washington Suburban Sanitary Commission, is permissive, rather than mandatory. The City of Rockville, by its Charter, is *authorized and empowered* "to pay the costs of all such work and assess said cost, *or any part thereof,* against the abutting property".

In its Ordinance No. 52-69 and Ordinance No. 28-70, each authorizing the issuance of bonds, the City did indeed recite that special annual benefit assessments were authorized, and dedicated as the primary source of payment of the bonds. Those assertions of future intent cannot be said to be the equivalent to a present levy, nor to establish present liability to an eventual lien. This is especially so when in the same ordinances the City bound itself to levy *ad valorem* taxes on all Rockville property sufficient to pay the principal and interest on the bonds, and further stated that it may apply to the payment of the bonds any funds received from the State of Maryland, the United States of America, or any agency or instrumentality thereof, or from any other source,

granted to assist the City in financing the public improvements.

We hold that the assessments in this case were not encumbrances until they were inevitable, and that as long as the City had the option to levy them or not, they were not inevitable until they were levied. The potential assessments were neither liens nor encumbrances when the policies of title insurance were issued. The entry of summary judgment in favor of the appellee was correct.

*Judgment affirmed.*
*Appellants to pay costs.*