MESSICK ET AL. *v.* SMITH, ET AL.

[No. 29, October Term, 1949.]

660

*Decided November 11, 1949*

*Motion for Reargument denied, and Memorandum thereon filed, January 11, 1950.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Amos W. W. Woodcock,* with whom were *E. Dale Adkins, Jr.,* and *Woodcock, Webb, Bounds & Travers* on the brief, for the appellants.

*Hamilton P. Fox, Jr.,* with whom were *Ernest C. Clark* and *Charles E. Hearne, Jr.,* and *Clark & Hearne* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree against defendants Messick in favor of plaintiffs, Smith, for $7742.89 and in favor of defendant Baker for $2045.78, and for enforcement of mechanics' liens for these amounts against a dwelling house built for defendants, for which Baker furnished the heating and plumbing. The question at issue is how much the Messicks owe for the house.

Plaintiffs contend that the house was built on a time and material basis; the Messicks that it was built under a written contract, dated August 12, 1946, between Frederick S. Messick and plaintiffs, for all the work and materials described in the specifications [including heat-

ing and plumbing] for $6850, payable within thirty days after completion, and that he thereafter agreed to pay $1000 for extra work, a total of $7850. Messick has paid $2519.14 to plaintiffs and $423.53 to Baker and has tendered plaintiffs the balance of $4907.33 [less $32.53, because of a clerical error not now disputed]. The Messicks say that plaintiffs must pay Baker. On a time and material basis, the gross amount payable was $12,731.34 ($10,262.03 to plaintiffs and $2,469.31 to Baker), of which $9,788.67 (the aggregate amount of the decree) is unpaid.

Messick was a discharged veteran. As such, he was entitled to make application for "priorities assistance" in purchasing materials for building a house for his own occupancy. Priorities Regulation 33, as amended June 14, 1946, par. (b) (1) ; C. F. R., 1946 Supplement, Title 32, sec. 944.54. On the prescribed Form C. P. A. 4386, he made such application, dated July 24, 1946, and priority was "assigned" to him by the Federal Housing Administration under date September 5, 1946. A proposed sales price was required to be stated, "to be applicable in the event of any future sale of the house." The proposed maximum sales price could not exceed $10,000. N. H. A. Regulations 90-1, effective April 12, 1946; C. F. R., Title 24, secs. 707.1-707.2. In Messick's application the blank "maximum proposed sales price" was originally filled in, by typewriter, "$8500", which by pen was cancelled and "$7750" substituted. The photostat in the transcript does not show whether this modification was noted in red. Below Messick's signature and above the signature of the F. H. A. agent is a notation, presumably by rubber stamp, "The beginning of any construction approved under this application will constitute acceptance by the applicant of the modifications noted in red in his application. Otherwise the approval of this application is void." On Form 4386 the applicant certifies "that the facts herein set forth are true and correct to the best of my knowledge and belief" and "that I will construct * * * the dwelling units, described

in this application in accordance with the description given, and that I will comply with the provisions of Priorities Regulation 33, including, wherever applicable, the requirements with respect to preferences for veterans and to sales prices, costs and rents." Form 4386 contains the statement: "Section 35 (A) of the United States Criminal Code, 18 U. S. C. sec. 80 [1948 Revised Criminal Code, 18 U. S. C. A. § 1001], makes it a criminal offense to make a willfully false statement or representation to any department or agency of the United States as to any matter within its jurisdiction."

Plaintiffs say that in June, 1946 the Messicks showed them plans for a house and asked approximately how much it would cost to build and were told approximately $7000. On July 24, 1946 Lee Smith signed an application for, and obtained, a building permit; in the application the "Estimated Cost" stated was "$7000." Work was started in July. Lee Smith testified that: On August 12th Messick "had a form letter from the agency that approved these priorities", which said, in effect, "Your application for priority has not been approved for the following reasons", and had a check opposite a paragraph to the effect that the application for priority had not been approved because no contract accompanied the application for priority. Messick asked him whether he would sign some sort of a paper to satisfy this requirement. He told Messick he would, but they would still reaffirm their agreement, "there would be no contract on the job, it would be time and material". He took a blank form of contract and made it out, typed it, it was signed by Messick and him, and presumably was sent by Messick to Baltimore in response to the letter. Where he got the figure of $6850 in the contract, "I really don't know". One of the things the federal administrator was interested in, he should say, was the price the house was going to cost. The whole purpose in filing the contract was to get a priority so that he could build the house. His statement in the contract that he agreed to build the house for $6850 was not true; in that it repre-

sents an agreement to build the house for $6850, it is false; he would not say it is a fraud.

Oscar Smith, the father, testifies that he knew he couldn't have bought the material unless he had had these priorities.

Messick flatly contradicts the Smiths. He testifies, in effect, that the contract of August 12, 1946 was a real contract, executed at Lee Smith's request, and that Smith said he was going to put it at $6850 "to protect himself" by an increase of $300 over a previously agreed price of $6200 plus an extra $350. He also testifies that Smith "was doing all the negotiation with the people in Baltimore to get the priorities, although it was being mailed to me because I was the owner".

Two questions are presented: 1. Was the real contract the written contract of August 12, 1946 or an oral contract on a time and material basis? 2. If the latter, are plaintiffs barred from recovery because of their participation in the false representation by which the priorities necessary for performance of the contract were obtained?

1. The first question is one of veracity. It might naturally be supposed that the written contract was honest and genuine and was not a false representation made to obtain priorities. However, the lower court saw and heard the witnesses and reached the opposite conclusion. We cannot say that this conclusion was clearly wrong. On the contrary, without reviewing the evidence, we may say that the court's conclusion is supported by circumstances, especially by Messick's conduct in paying a bill on account, on a time and material basis, after checking it and correcting an error of $1, and also paying two similar bills of Baker. Subject to consideration of the second question, we may assume, as the lower court held, "that parol testimony may be admitted to show that what purports to be a written contract between the parties was never intended, in fact, by said parties to be a contract. *Southern [Street-Railway] Advertising Co. v. Metropole [Shoe Mfg.] Co.*, 91 Md 61 [46 A. 513]; *Birely & Sons v. Dodson*, 107 Md. 229 [68 A. 488]."

2. Messick contends that, on this view of the facts, plaintiffs are barred from relief in equity because they do not come into court with clean hands. On this question the lower court says, quoting *Thomas v. Klemm,* 185 Md. 136, 142, 43 A. 2d 193, that the clean hands maxim "closes the doors of a court of equity to any person who has violated any of the fundamental principles of equity relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant", but also quotes from the same opinion, "It is an accepted rule that if the alleged wrongful conduct of a complainant appears not to have injured the defendant, the maxim cannot be successfully invoked. *First National Bank of Catonsville v. Carter,* 132 Md. 218 [103 A. 463] ; * * *", and then concludes, "We cannot see how the defendant, Messick, has been injured by the signing of the alleged contract. Evidently, it was the means by which the necessary priorities were secured and the house completed to the benefit and advantage of Messick." If this is a correct application of the sentence last quoted from *Thomas v. Klemm,* then *Schaeffer v. Sterling,* 176 Md. 553, 6 A. 2d 254 (cited in *Thomas v. Klemm*), was wrongly decided, since the bank—and its depositors—by receipt of money obtained by duress by the directors from the parents of the cashier-embezzler, manifestly were not injured, but were benefited. If this doctrine is a correct application of the policy underlying price control legislation and other prohibitory legislation, then the courts are open to every bootlegger or "black market" dealer (if any) who may give credit to his customers, for collection of their unpaid accounts.

In the first two of five Thomas M. Cooley Lectures at the University of Michigan in April, 1949, on "Some Problems in Equity", Professor Chafee discusses at length "Coming into Equity with Clean Hands." 47 Michigan Law Review 877-906, 1065-1096. He traces the history of the maxim to its first statement in its present form in 1787 by Chief Baron Eyre in *Dering v. Earl of Winchelsea,* 1 Cox Eq. 318 and farther back

to "its appearance in quite different language" in 1728 in "Maxims of Equity" by Francis. He quotes from Francis a footnote, "The iniquity must be done to the defendant himself", which he characterizes as "especially repudiating the modern doctrine", but which foreshadows the sentence in *Thomas v. Klemm* on which plaintiffs rely and similar statements in other jurisdictions. At the beginning of the first lecture Professor Chafee in advance sums up his conclusions by saying that he proposes "to show that the clean hands doctrine does not definitely govern anything, that it is a rather recent growth, that it ought not to be called a maxim of equity because it is by no means confined to equity, that its supposed unity is very tenuous and it is really a bundle of rules relating to quite diverse subjects, that in so far as it is a principle it is not very helpful but it is at times capable of causing considerable harm." 47 Michigan Law Review 878.

We have no occasion to pursue the details of Professor Chafee's interesting iconoclastic discussion, which is revolutionary in classification and nomenclature, not in application, of legal principles. In *Thomas v. Klemm, supra,* and also in *First National Bank v. Carter, supra,* the court found no fraud on the part of the plaintiff and therefore no occasion to apply either the clean hands maxim, as broadly stated in *Thomas v. Klemm,* or the qualification as to injury to the defendant. The instant case is not within the qualification but is within the clean hands maxim *eo nomine* or the underlying principle under some better name (*e. g., ex dolo malo non oritur actio*), and illustrates Professor Chafee's statement that the maxim "ought not to be called a maxim of equity because it is by no means confined to equity." When a plaintiff's wrongful conduct is not contrary to law or public policy, he is not barred unless it injures the defendant. "Equity does not demand that its suitors shall have led blameless lives." *Loughran v. Loughran,* 292 U. S. 216, 229, 54 S. Ct. 684, 689, 78 L. Ed. 1219; *Meeks v. Meeks,* 189 Md. 80, 87, 54 A. 2d 334, 337.

A builder who sues to enforce a mechanics' lien or fore-close a mortgage is not barred because he beats his wife or in some unrelated matter has cheated the Government out of taxes. But when plaintiff and defendant have participated in fraudulent or illegal conduct, contrary to law or public policy or in fraud of the law itself, and are in *pari delicto,* plaintiff cannot maintain suit—at law or in equity—directly arising out of the misconduct. *Holman v. Johnston,* 1 Cowp. 341, 343; *Roman v. Mali,* 42 Md. 513, 561-562; *Oscanyan v. Arms Co.,* 103 U. S. 261, 267, 26 L. Ed. 539.

When a transaction involves violation of a statute the clean hands maxim—or the maxim *ex dolo malo*—is not applied if, by application of the maxim, the legislative purpose would not be furthered, but would be hindered or thwarted. *Frost & Co. v. Coeur D'Alene Mines Corp.,* 312 U. S. 38, 43, 61 S. Ct. 414, 85 L. Ed. 500. When the plaintiff is one of a class for whose protection or benefit the statute was enacted, he may be regarded as not in *pari delicto.* The legislative purpose of price control legislation and veterans' legislation is to protect the public against inflation and waste and to protect and benefit veterans in obtaining low-price housing. Under the Emergency Price Control Act, 50 U. S. C. A. Appendix, § 901 *et seq.,* recovery or restitution of the excessive —and unlawful—portion of prices or rents paid is permitted both by express statutory provision, (*Lambros v. Brown,* 184 Md. 350, 41 A. 2d 78,) and also by broad construction of more general provisions, in the light of the purposes of the act. *Porter v. Warner Holding Co.,* 328 U. S. 395, 66 S. Ct. 1086, 90 L. Ed. 1332. Veterans' legislation reflects the general purposes of price control legislation and the special purpose of protecting and helping veterans. *Cf. Heinicke v. Parr,* 6 Cir., 168 F. 2d 194; *Keele v. Holt,* 5 Cir., 171 F. 2d 480; *Elmers v. Shapiro,* Cal. App., 205 P. 2d 1052, 1060. In the instant case plaintiffs say the purpose of the price limitations in the application for priorities was to prevent profiteering by veterans. If it be assumed that this was

one of the purposes, it is none the less clear that the primary purpose of the limitation upon sale by the veteran was the same as the purpose of the limitation upon sale to a veteran by a builder, *viz.*, to prevent inflation and waste and to help the veteran and protect him from extortion—and from his own extravagance. Naturally the governmental agency would ask to see the contract whether for a fixed price or on a cost-plus basis. It is incredible that the agency would approve an application, for a house which would or probably might cost $12,000 or $13,000, on an application which named a maximum price of $7,750 and could not have named more than $10,000.

Interpretation or application of the terms or underlying purpose of federal statutes, or regulations under them, is a federal question. *Awotin v. Atlas Exchange Nat. Bank,* 295 U. S. 209, 213-214, 55 S. Ct. 674, 79 L. Ed. 1395; *Deitrick v. Greaney,* 309 U. S. 190, 200-201, 60 S. Ct. 480, 84 L. Ed. 694; *Frost & Co. v. Coeur D'Alene Mines Corp.,* 312 U. S. 38, 40, 61 S. Ct. 414, 85 L. Ed. 500. To permit plaintiffs to recover on a contract performed by means of priorities obtained by false representation, in which plaintiffs actively participated, would be contrary to the true interpretation and application of the controlling federal legislation and regulations. We are not called upon to say whether, if Messick had paid the price now demanded, he could have maintained suit to recover any part of what he had paid.

The evidence does not show participation by Baker in false representation. The decree as to Baker should be affirmed, payable out of the $4874.80 tendered. Messick does not dispute payment of the amount tendered—or the $32.53 omitted by mistake in making the tender. In exceptional cases it has been held that by estoppel one may be required to perform a written contract which he signed with the understanding that it should not be binding but that it should be falsely represented to a public official as a binding contract. Thus estoppel effects a virtual specific performance of the false representa-

tion. *Deitrick v. Greaney,* 309 U. S. 190, 196-197, 60 S. Ct. 480, 84 L. Ed. 694; *New v. Page,* 144 Md. 606, 610-611, 125 A. 403. The primary purpose of price legislation and veterans' legislation is compliance and restitution. There should be a decree for plaintiffs for $4,907.33, the corrected amount of the tender, less $2,045.78, the amount of Baker's decree.

> *Decree affirmed in part and reversed in part, with costs, and cause remanded for passage of a decree in accordance with this opinion.*

### MEMORANDUM ON MOTION FOR REARGUMENT

**PER CURIAM:**

Plaintiffs ask a reargument or a modification of the opinion to permit them to recover on a time and material basis for extra work not covered by the written contract and, therefore, (they contend) not tainted by the false representation of the written contract as genuine. In permitting plaintiffs to make their representation good, instead of losing even the compensation tendered by defendants, we made a somewhat novel, though we think sound, application by analogy of principles applied in somewhat different cases. Assuming, without deciding, that the principle applied should be carried as far as plaintiffs now ask, the evidence is quite inadequate to support any larger recovery than we have allowed. We do not think that at this stage a wrongdoer, at least *in pari delicto* if not *in majore delicto,* should be given a further opportunity to retry the case on a theory not suggested at the trial below.

*Motion overruled.*