715 A.2d 199

**CHEVY CHASE BANK, FSB**

v.

**William M. CHAIRES et ux.**

**No. 118, Sept. Term, 1997.**

Court of Appeals of Maryland.

Aug. 3, 1998.

Reconsideration Denied Sept. 10, 1998.

F. Robert Troll, Jr. (Matthew D. Osnos, O'Malley, Miles, Nylen & Gilmore, P.A., on brief), Calverton, for appellant.

Cyril V. Smith (Zuckerman, Spaeder, Goldstein, Taylor & Better, L.L.P., on brief), Baltimore, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

The issue of public importance in this case lies at the intersection of two statutes, the Secondary Mortgage Loan–Credit Provisions Law (SMLL), Maryland Code (1975, 1990 Repl.Vol.), §§ 12–401 through 12–415 of the Commercial Law Article (CL), and the Shore Erosion Control Law (SECL), Maryland Code (1974, 1990 Repl.Vol., 1997 Cum.Supp.), §§ 8–1001 through 8–1008 of the Natural Resources Article (NR). The appellees contend, and the Circuit Court for Prince George's County concluded, that the appellant's refinancing of a mortgage on appellees' waterfront residential property, that was subject to a prior lien of the State under SECL, constituted a second mortgage under SMLL. We agree with the conclusion of the circuit court on that issue. We agree, however, with the appellant's contention that, under the unique facts of this case, appellees are estopped from claiming under SMLL.

In 1980, William M. Chaires, one of the appellees, purchased a piece of unimproved waterfront land located at 5 Loudon Lane in Annapolis, Maryland for $90,000 (the Loudon Lane property). The property was eroding into the Severn River. Thereafter, Mr. Chaires was contacted by the Maryland Department of Natural Resources (DNR) about the construction of a bulkhead which would control the erosion problem. Pursuant to SECL, DNR loaned Mr. Chaires the cost of constructing the bulkhead, $20,690. The principal was repayable over twenty-five years at the rate of $827 per year, without interest, secured by a statutory lien on the Loudon Lane

property (the Shore Lien). On January 12, 1981, the Shore Lien was recorded in the Land Records of Anne Arundel County. In 1985 William Chaires and the other appellee, Laurie G. Chaires, were married, and Mr. Chaires placed the title to the Loudon Lane property in the names of the two as tenants by the entireties.

In January 1988, the Chaireses made a loan from Queenstown Bank of Maryland (the Queenstown Loan) of up to $350,000, secured by a deed of trust on the Loudon Lane property. This was to be used for the construction of a residence on the property. The deed of trust securing the Queenstown Loan does not recite that it is a second mortgage, nor does the record reflect that the Chaireses ever claimed that the Queenstown Loan was subject to SMLL.

Earlier the Chaireses had met with a representative of B.F. Saul Mortgage Company (B.F. Saul) to discuss a residential first mortgage loan in the amount of $350,000, and the Chaireses returned to B.F. Saul to refinance the Queenstown Loan. That refinancing closed on June 14, 1988. With the consent of B.F. Saul, Mr. Chaires, who is a Maryland lawyer, acted as settlement attorney.

The loan from B.F. Saul to the Chaireses was in the amount of $350,000, repayable over forty years, at an adjustable rate of 7.625%, and secured by a deed of trust on the Loudon Lane property (the B.F. Saul Loan). The entire principal amount of the B.F. Saul Loan was used to pay off the Queenstown Loan, then amounting to $350,000. In order to close on the B.F. Saul Loan, the borrowers were required to produce $6,399 of their own funds in order to pay an origination fee of 1.5 points, advance interest, and other charges. Mr. Chaires testified that he never had any intention of paying off the interest-free Shore Lien as part of the closing on the B.F. Saul Loan. B.F. Saul assigned the loan to the appellant, Chevy Chase Bank, FSB (Chevy Chase), on the day the loan was made.

Payments under the B.F. Saul Loan, initially in the amount of $1,895.34 per month, were due on the first of the month. If a payment was not received by the sixteenth of the month, the

borrowers incurred a late charge of five percent. The Chaireses characterized this fifteen-day window as a "grace period," and often failed to remit their mortgage payment until sometime after the first of each month. Chevy Chase assessed the Chaireses with periodic late charges as well as $45.00 in fees for checks returned for insufficient funds. On two occasions in the history of the loan, in December 1994 and August 1995, Chevy Chase forwarded the loan to an attorney for foreclosure. On each occasion the borrowers cured the delinquencies before foreclosure.

In May 1995, the Chaireses filed suit in the Circuit Court for Prince George's County against Chevy Chase and B.F. Saul. After several amendments, the complaint contained eleven claims: (1) illegal lending practices under SMLL, (2) violations of the Maryland Consumer Debt Collection Act, (3) breach of contract, (4) intentional infliction of emotional distress, (5) declaratory relief, (6) civil conspiracy, (7) breach of an implied covenant of good faith and fair dealing, (8) civil RICO and mail fraud against B.F. Saul, (9) civil RICO and mail fraud against Chevy Chase, (10) unfair debt collection prohibited by federal law, and (11) fraud. The claim for declaratory judgment was based on CL § 12–413 which provides in part that "[e]xcept for a bona fide error of computation, if a lender violates any provision of [SMLL] he may collect only the principal amount of the loan and may not collect any interest, costs, or other charges with respect to the loan." Plaintiffs sought a judgment determining the total amount of all payments to Chevy Chase and declaring that those payments reduced the principal amount of the loan.

The Chaireses' theory of the case was that the Shore Lien was a first lien on the Loudon Lane property, making the B.F. Saul Loan a second mortgage regulated by SMLL. The borrowers claimed SMLL violations based on Chevy Chase's requirement for property insurance in excess of the replacement cost of the improvements, imposition of late fees, requests that certain payments be made by certified check, failure to allow a statutory ten-day grace period, use of an adjustable interest rate, and the imposition of certain interest

charges, fees for dishonored checks, property inspection fees, and other charges. Asserting that the lenders had violated SMLL as a matter of law, the Chaireses sought a partial summary judgment finding the lenders liable on the SMLL count of the complaint.

The lenders' defense to this motion for partial summary judgment was that the loan was not a second mortgage lien for purposes of SMLL; rather, the Shore Lien was a benefit assessment that was current and was to be treated similarly to future taxes.

The circuit court entered partial summary judgment in favor of the Chaireses, ruling that the Shore Lien was a lien of prior encumbrance under SMLL. Summary judgment was granted in favor of B.F. Saul on all counts and in favor of Chevy Chase as to Counts Four, Eight, Nine, Ten, and Eleven.[1] The court reserved as a factual question whether Chevy Chase engaged in conduct that violated SMLL. The case was tried to a jury on the plaintiffs' claims against Chevy Chase for damages for illegal lending practices under SMLL, violations of the Maryland Consumer Debt Collection Act, breach of contract, and breach of an implied covenant of good faith and fair dealing, as well as on issues relating to declaratory relief.

The verdict consisted of answers to special interrogatories. The jury found that Chevy Chase had violated SMLL as to each of the plaintiffs by charging one or more impermissible fees, by including in the loan contract an impermissible acceleration clause, by requiring unequal installment payments produced by utilizing an adjustable rate of interest, and by requiring property insurance coverage in excess of the replacement cost of the residence.

The jury further found that the principal amount of the loan was $350,000 and that the amount paid by the Chaireses was $277,000. These findings related to that part of CL § 12–413,

---

1. There is no cross-appeal by the Chaireses from these rulings.

quoted above, that limits to principal the amount collectible by a lender who violated SMLL.

Additionally, the jury found that Chevy Chase "knowingly" violated SMLL. This finding related to another part of CL § 12–413 which provides that "a lender who knowingly violates any provision of [SMLL] also shall forfeit to the borrower three times the amount of interest and charges collected in excess of that authorized by law." The jury found that the treble interest amount was $3,704 as to each plaintiff.

CL § 13–301(14)(iii) makes it an unfair or deceptive trade practice in violation of the Consumer Protection Act, CL Title 13, to violate a provision of the Maryland Consumer Debt Collection Act, CL Title 14, Subtitle 2. The jury found that Chevy Chase had violated the Consumer Protection Act in that fashion. The Consumer Protection Act authorizes "any person [to] bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by [the Consumer Protection Act]." CL § 13–408(a). The court submitted a special interrogatory to the jury that defined injury or loss to include emotional distress or mental anguish. The jury found that William Chaires had not suffered any injury but that Laurie Chaires was injured, for which damages in the amount of $5,000 were awarded.

With respect to the count of the complaint alleging breach of contract, the jury found that Chevy Chase had materially breached the B.F. Saul Loan contract as to both plaintiffs, to whom the jury respectively awarded $8,619 in damages. On the count alleging breach of an implied obligation of good faith, the jury found in favor of Chevy Chase.

Thereafter, the court rendered a final judgment in favor of the plaintiffs, by entering judgments for the monetary damages and by entering a declaratory judgment implementing the findings concerning civil penalties available under SMLL, CL § 12–413. The court declared that the principal balance of the mortgage loan was $73,000 ($350,000 less $277,000) and decreed that the $73,000 would be payable in equal install-

ments, without interest, over the remaining term of the B.F. Saul Loan.

At the same time that final judgment was entered, the court also awarded $73,700 in counsel fees to the attorneys for William Chaires and $14,437.50 in counsel fees to the attorney for Laurie Chaires.[2]  These counsel fees were awarded pursuant to SMLL and to the Consumer Protection Act.  The section of SMLL that prohibits required property insurance in excess of replacement cost of the mortgaged residence provides for reasonable attorney's fees.  See CL § 12–410(d)(1)(v)2.  Further, the Consumer Protection Act provides that "[a]ny person who brings an action to recover for injury or loss under [CL § 13–408(a) ] and who is awarded damages may also seek, and the court may award, reasonable attorney's fees."  CL § 13–408(b).  In the instant matter that person is Laurie Chaires, the only plaintiff to whom damages were awarded for a violation of the Maryland Consumer Debt Collection Act, as incorporated into the Consumer Protection Act by CL § 13–301(14)(iii).

Chevy Chase appealed to the Court of Special Appeals. Prior to consideration of this matter by that court, we issued the writ of certiorari on our own motion.  In this Court Chevy Chase contends (1) that the Shore Lien was not a prior lien so that the B.F. Saul Loan was not a second mortgage regulated by SMLL, (2) that the plaintiffs were estopped from asserting claims based on applying SMLL to the transaction, (3) that federal regulations governing federal savings banks preempted application of SMLL to the B.F. Saul Loan, and (4) that the award of attorneys' fees was excessive.  Chevy Chase does not appeal those portions of the judgment finding that it violated the Maryland Consumer Debt Collection Act and that it breached its contract with the Chaireses.

Additional facts will be set forth, as necessary, in discussing particular issues.

---

2.  A claim by Mr. Chaires for counsel fees, payable to himself for representing himself, was denied because of "uncertainty" in the number of hours worked.

I

In holding that SMLL applied to the transaction when granting partial summary judgment to the plaintiffs, the circuit court concluded that the B.F. Saul Loan fell within the statutory definition of a secondary mortgage because the Shore Lien was a "lien . . . of prior encumbrance[ ]" under CL § 12–401(i)(1). Section 12–401(i) reads, in part, as follows:

"*Secondary mortgage loan.*—(1) 'Secondary mortgage loan' means a loan or deferred purchase price secured in whole or in part by a mortgage, deed of trust, security agreement, or other lien on real property located in the State, which property:

(i) Is subject to the lien of one or more prior encumbrances, except a ground rent or other leasehold interest; and

(ii) Has a dwelling on it designed principally as a residence with accommodations for not more than four families." [3]

The Shore Lien secures an interest-free loan from the State, as authorized by SECL. The loan is part of a program whose purpose is to control shore erosion.

SECL creates the Shore Erosion Control Construction Loan Fund (the Fund). The Fund is maintained by repayments of principal on loans made from the Fund and by annual appropriations of general funds. NR § 8–1005(a)(1). The owner of any property abutting any body of water in the State may apply for assistance from the Fund. NR § 8–1003. Property owners whose projects are approved are eligible to receive loans, the amount of which is governed by a sliding scale in relation to project construction costs. NR § 8–

---

**3.** "Lien on real property" is defined in CL § 12–401(d) only by way of inclusion. The phrase includes:

"(1) A confessed judgment note or consent judgment required by a person who ordinarily requires such an instrument for the purpose of acquiring a lien on property described in subsection (i) of this section; and

(2) A sale and leaseback required by a person for that purpose."

1005(a)(2). Cash contributions by the property owner may be required for projects over $60,000. *Id.* The property owner is also required to execute a written notice to proceed, NR § 8–1005(d)(2), at which time DNR causes a notice of lien to be recorded. NR § 8–1005(d)(4). That notice describes the lien priority provided by § 8–1006, set forth, *infra.* When a shore erosion control project has been satisfactorily completed, the Board of Public Works, on certification from DNR, levies a benefit charge payable in annual installments, due July 1, over a period of up to twenty-five years. The charge is calculated to return the net project construction cost to the State, without compensation to the State by way of interest for the use of the public funds. NR § 8–1006(a) and (b).

NR § 8–1006 further provides as follows:

"(c) *Lien; collection of installments in default.*—A benefit charge assessed under this subtitle shall be a lien on the real property against which the benefit charge is assessed, and shall be subject to collection in the manner specified for foreclosure of mortgages. Any annual installments in default shall be a first lien on the benefited property, subject only to prior State, county, or municipal real property taxes. *The outstanding balance of a benefit charge shall be afforded normal lien priority,* except that the Department may agree in writing to grant precedence to a subsequent mortgage or deed of trust if necessary for refinancing, transfer, or improvement of a benefited property.

"(d) *Sale of benefited property.*—Annual installments shall be a personal obligation of the owner of a benefited property at the time the installments become due. Sale of a benefited property may not extinguish a lien under this subtitle, and the purchaser in all instances shall take the property subject to any outstanding balance of the total benefit charge still unpaid at the conclusion of the sale, and shall be required to meet the same annual installments as previously were being assessed. Any notice of sale clearly shall identify this potential liability, provided that failure to so notify may not affect the obligation if the notice of lien

required under § 8–1005(d)(4) of this subtitle is filed properly."

(Emphasis added).

NR § 8–1007(a) addresses transfers of property subject to a shore lien with the following provision.

"*Recording transfer of benefited property.*—For purposes of § 3–104 of the Real Property Article, which pertains to payment of taxes as a prerequisite to recording of any transfer of property, it is sufficient that all current annual installments of any benefit charge levied under this subtitle have been paid."

■ In entering partial summary judgment for the plaintiff, the circuit court analyzed the interrelationship between SMLL and SECL as follows:

"The shore liens have normal lien priority (except for amounts in default which have first priority), they are payable over time, the property is security for the loan, they can be subordinated, and while they do not contain a power of sale, the statute provides they may be enforced in the same manner as specified for foreclosure of mortgages, implying the power of sale, all in the manner of a traditional lien on property.

"More obviously, [NR §] 8–1006(c) establishes the shore lien as a lien on the real property against which the benefit is assessed, and gives it normal lien priority (except for payments in default which go first in priority after State, county, or municipal real property taxes). Nothing in [SMLL] states that the prior encumbrance must be a traditional mortgage or deed of trust in order to qualify it as a prior encumbrance subject to the provisions of the secondary mortgage statute."

The issue here is whether the Shore Lien is the type of lien that can trigger the application of the restrictions on lenders imposed by SMLL when the property owner later obtains a commercial loan secured by the property which also secures the earlier shore erosion loan.

In its argument to us, Chevy Chase analogizes the Shore Lien to real estate taxes, but that analogy is not complete. Property taxes become due on July 1 in each taxable year. Md.Code (1986, 1994 Repl.Vol.), § 10–102(a) of the Tax–Property Article (TP). "[P]roperty tax that is due on July 1 of the tax year may be paid without interest on or before September 30 of the tax year, and is in arrears after September 30 of the tax year." TP § 10–102(b). All unpaid real property taxes are liens on the realty from the date the taxes become "payable." TP § 14–804(a). A first lien attaches to the real property in the amount of the property tax "[f]rom the date property tax on real property is due." TP § 14–805(a). Federal courts have concluded that the real property tax lien in Maryland arises on July 1 of the tax year. *See Maryland Nat'l Bank v. Mayor & City Council of Baltimore*, 723 F.2d 1138, 1141 (4th Cir.1983); *In re Sylvia Dev. Corp.*, 178 B.R. 96 (Bkrtcy.D.Md.1995); *In re Reamy*, 169 B.R. 352 (Bkrtcy. D.Md.1994).

Chevy Chase's analogy to real estate taxes benefits it, but only as to that aspect of the Shore Lien which gives to *an unpaid current installment* of the benefit assessment a priority that is senior to all but "prior State, county, or municipal real property taxes." NR § 8–1006(c). In enacting SMLL the General Assembly could not have intended that a lien securing a commercial mortgagee, who enjoyed a first lien when the loan was made, periodically would move into and out of secondary lien status under SMLL depending on how promptly the borrower paid real estate taxes in any given year. Similarly, a shore lien that is recorded after a prior mortgage would not convert the prior lien into a secondary mortgage under SMLL solely because an annual installment of the shore lien is not timely paid, thereby causing a lien, to the extent of that unpaid installment of the shore erosion loan, to leapfrog a senior mortgage.

The Chaireses' position, however, rests not on the priority granted delinquent installments of shore lien benefit assessments, but on the "normal lien priority," NR § 8–1007(c), that this Shore Lien enjoys by virtue of its priority in time and

recordation over the B.F. Saul Loan, and indeed, over the Queenstown Loan that the B.F. Saul Loan refinanced. The Chaireses submit that

> "Chevy Chase's argument that the Shore Lien is not an encumbrance under [SMLL] would go further than requiring an exception to [SMLL]. It would require that an exception be added to [SMLL] and that the 'normal lien priority' afforded shore liens . . . be ignored. . . ."

Brief for Appellees at 15.

Secondary mortgage loans were originally regulated by Chapter 390 of the Acts of 1967.[4] As originally enacted the statute included both credit and licensing provisions. In the 1975 enactment of the Commercial Law Article, as part of the Code Revision process, the two types of provisions were split, the credit provisions becoming SMLL while the licensing provisions remained a part of Article 66, Title, "Mortgages." *See* Md.Code (1957, 1979 Repl.Vol.), Art. 66, §§ 39 through 60, §§ 68 through 70. Only stylistic changes were made in 1975 to the definition of a secondary mortgage loan, now codified as CL § 12–401(i). *See* Revisor's Note to Code (1975) CL § 12–401(j). That definition has not been substantially changed to date. When enacting SMLL in 1967 the General Assembly did not have SECL before it.

A shore erosion control program under which the State made loans to the owners of privately owned shore front properties was first authorized by Chapter 563 of the Acts of 1969, and that statute was refined and the Fund was established by Chapter 245 of the Acts of 1970. To enforce collection of loans made under the SECL program the State originally relied on the contractual rights of DNR (including its predecessor agencies) under agreements between DNR and a property owner. *See* Md.Code (1957, 1970 Repl.Vol.), Art. 66C, § 758A. Chapter 615 of the Acts of 1980 first

---

4. A bill regulating the secondary mortgage industry had been introduced as House Bill 259 in the 1966 session of the General Assembly. That bill passed but was vetoed by Governor J. Millard Tawes. *See* 1966 Md. Laws at 1441.

enacted the lien provisions presently found in NR § 8–1006(c).[5] One of the purposes of Chapter 615 was "eliminating all references to agreements between [DNR] and property owners as constituting the basis for repayment." 1980 Md. Laws at 2150.

Under the plain meaning of SMLL § 12–401(i)(1)(i) the Shore Lien is a "lien of . . . prior encumbrance[ ]." In *Manor Real Estate Co. v. Jos. M. Zamoiski Co.*, 251 Md. 120, 246 A.2d 240 (1968), we quoted with approval the trial judge's statement that " 'a lien is always an encumbrance, but an encumbrance need not necessarily be a lien.' " *Id.* at 125, 246 A.2d at 243. Two decisions of this Court, dealing with the effect of Washington Suburban Sanitary Commission (WSSC) benefit assessments under the language found in particular contracts for the sale of real estate, demonstrate that the Shore Lien is at least an encumbrance. *Id.; Morris v. Ehlers,* 211 Md. 23, 124 A.2d 776 (1956).

In *Morris,* the contract provided that assessments for improvements completed prior to the date of the contract, whether the assessment was levied or not, would be paid by the sellers. *Morris,* 211 Md. at 25, 124 A.2d at 777. The sellers resisted deducting from their net sale proceeds the total of all of the annual payments of a WSSC benefit assessment to be made over the remaining life of the assessment. The sellers relied on testimony describing a custom in Montgomery County "under which only annual current instalments of front foot benefit charges made by the [WSSC] are adjusted to the date of transfer and under which no allowance is made for the unpaid portion of the original assessment." *Id.* at 27, 124 A.2d at 779. The Court held that, under the contract, the sellers were obliged to pay the aggregate assessments.

---

5. In 1980, when shore liens were statutorily created, the secondary mortgage loan licensing provisions were found in Md.Code (1980), §§ 12–301 through 12–321 of the Financial Institutions Article (FI). The provisions for licensing SMLL lenders are now part of the Maryland Mortgage Lender Law, Md.Code (1980, 1998 Repl.Vol.), FI §§ 11–501 through 11–524.

In *Morris,* this Court noted that courts in the District of Columbia had held that WSSC benefit assessments became liens only to the extent of a delinquent annual installment. See *District Title Ins. Co. v. United States,* 169 F.2d 308 (D.C.Cir.1948), and *Union Realty Co. v. Ahern,* 93 A.2d 84 (D.C.App.1952); see also *Ahrens v. Broyhill,* 117 A.2d 452 (D.C.App.1955). Montgomery County Code (1955) § 74–37.c specified that the benefit assessments involved in *Morris* "shall for all purposes of collection be treated as county taxes...." Nevertheless, this Court pointedly abstained from opining on whether the "charges constituted liens against the property for the full amount thereof from the dates when they became final under the statute, or whether they constituted liens only as and when annual charges were entered...." *Morris,* 211 Md. at 28, 124 A.2d at 779.

*Manor Real Estate Co.* involved provisions in a contract for the sale of realty, including a promise to convey clear of all liens and encumbrances. 251 Md. at 122, 246 A.2d at 241. The purchaser asserted that the vendor thereby was contractually liable for the aggregate of installments to be paid under a WSSC benefit assessment. The Court held that the vendor was liable because the stream of assessment installments constituted an encumbrance. Because the vendor's promise included both liens and encumbrances, this Court once again found it unnecessary to decide whether the benefit assessments to be paid in the future constituted a lien. *Id.* at 129–30, 246 A.2d at 245. The method for collecting unpaid benefit assessments of the type involved in *Manor Real Estate Co.* was the same as that for collecting real property taxes, as provided by Prince George's County Code (1963) § 83–72(c), the language of which is identical to that appearing in the section of the Code of Public Local Laws of Montgomery County that was involved in *Morris.*

The vendor in *Manor Real Estate Co.* insisted "that the benefit charge is in reality a tax." 251 Md. at 131, 246 A.2d at 246. Rejecting that argument this Court said:

"But there are important differences between real estate taxes and WSSC benefit charges. Taxes are levied annual-

ly; the benefit charge is levied but once. Taxes change as to amount depending on changes in the tax rate and fluctuations in the assessed value of the property; the annual instalments of the benefit charge remain constant. Taxes continue indefinitely; the annual instalments of the benefit charge cease when the bonds are retired. Taxes cannot be 'redeemed or extinguished' by the payment of a determinable amount; the benefit charge can be so redeemed or extinguished. Taxes, except special taxes, become a part of the county's general fund; the benefit charge can be used only to amortize and service the bond issue. And however unlikely it may seem to us now, it is possible that new sources of revenue may, at some future time, result in the elimination of the tax on real estate; the benefit charge must continue inexorably to its predetermined expiration."
*Id. See also* J. Cole *et al., Special Risks for Title Insurers and Lenders* at 87 (MICPEL 1989).

Thus, the SECL benefit assessment is clearly an encumbrance. Further, from and after Chapter 615 of the Acts of 1980, it is also a lien. "The modern conception of a lien is that it is a right given by contract, statute or rule of law to have a debt or charge satisfied out of a particular property." 3 Am. Law of Property § 1320, at 537 n.4 (A.J. Casner ed.1952). Here, NR § 8–1006(c) creates a statutory lien in favor of the State ("A benefit charge assessed under this subtitle shall be a lien on the real property against which the benefit charge is assessed."), not only as to an annual installment in default (which "shall be a first lien on the benefited property, subject only to prior State, county, or municipal real property taxes") but also as to the "outstanding balance of a benefit charge [which] shall be afforded normal lien priority." Further the method for enforcing the lien is not tied to annual taxes. The State may enforce collection "in the manner specified for foreclosure of mortgages." *Id.*

Nor is it possible in any principled fashion to carve the Shore Lien out of SMLL based on the purpose of SMLL. That purpose was to protect consumers. *See Schmidt v. Beneficial Fin. Co.*, 285 Md. 148, 400 A.2d 1124 (1979) (second mortgage

loan made by lender licensed only under the Maryland Consumer Loan Law, now CL §§ 12–301 through 12–317, but whose transaction fell within the definition of a secondary mortgage under SMLL was limited to the lower rate of interest permitted under SMLL and violated the latter by charging the higher interest permitted under the Maryland Consumer Loan Law); *Thoreson v. Shaffer,* 111 Md.App. 689, 683 A.2d 1153 (1996).[6] Although it may be unlikely that the General Assembly in enacting SMLL specifically contemplated first liens on residential property that were made directly by the State or local government, a judicial construction of SMLL that carved out loans made by a governmental entity, or non-interest bearing loans made by a governmental entity, could have the side effect of excluding from SMLL the very class of consumers primarily intended to be protected by that statute. For example, under the Maryland Home Financing Program, Md.Code (1957, 1995 Repl.Vol.), Art. 83B, §§ 2–601 through 2–614, the Department of Housing and Community Development (the Department) may make loans directly to households of limited income for the purpose of purchasing, purchasing and rehabilitating, or refinancing a primary residence. § 2–602(1). These loans are at preferred interest rates. § 2–601(g). The Department, further, through its Community Development Administration, is authorized to purchase from mortgage lenders residential mortgage loans made to families of limited income. § 2–612. Article 83B, §§ 2–301 through 2–313 authorize the Maryland Housing Rehabilitation Program that is administered by the Department. One of the activities of the Regular Loan Program that deals with residential buildings providing four or less dwelling units, § 2–303(a), is to "make loans on such terms as the Department deems necessary to make the housing affordable to families of limited income." § 2–303(f). These loans are made to the owner, § 2–302(u), who may or may not be a non-profit sponsor. § 2–302(k)(1), (l). The interest on loans under this program may be as low

---

6.  Chevy Chase advances no argument that its loan to the Chaireses was made pursuant to the credit grantor Closed End Credit Provisions subtitle, CL §§ 12–1001 through 12–1028.

as "0.0%." § 2–303(f)(2). The General Assembly has also created the "Residential Mortgage Program," Art. 83B, §§ 2–401 through 2–409. Under that program certain counties, § 2–403(2), are authorized to issue bonds, § 2–406, the proceeds of which are to be used, *inter alia,* to purchase, pursuant to prior commitment or otherwise, § 2–404, mortgages made to persons and families of low and moderate income who "lack the financial ability to pay prices or rentals sufficient to induce private enterprise in the county to build a sufficient supply of adequate, safe, and sanitary dwellings without the special assistance afforded by" the Residential Mortgage Program. § 2–403(1).

Thus, under the programs described above, and perhaps under others created by the federal, State, or local governments, if a first mortgage made or purchased by the governmental entity were excluded from consideration as a lien of prior encumbrance under SMLL, persons whose economic circumstances make them primarily intended beneficiaries of SMLL would be deprived of protections under that statute. Although we can probably take judicial notice of the fact that waterfront residential property in and around the City of Annapolis is among the most valuable residential realty in the State, the General Assembly did not provide any means test as a condition of invoking SMLL, and it is not the judicial function to do so. For these reasons, we hold that the B.F. Saul Loan acquired by Chevy Chase is a secondary mortgage loan under SMLL.

## II

Chevy Chase next argues that its motion for judgment as to the claims based on SMLL should have been granted because the plaintiffs were estopped from asserting that Chevy Chase violated SMLL. We agree. In a nutshell, Mr. Chaires, as the attorney representing all parties to the transaction, faced an actual and grave conflict of interests but failed to make the full disclosure required for the transaction to proceed in the fashion in which it was consummated.

The pertinent facts, in contrast with the legal conclusions, are not disputed. On March 31, 1988, B.F. Saul offered to make a $350,000 adjustable rate mortgage to the Chaireses, subject to a number of conditions. Condition four provided, in part, that "[p]romptly after settlement a Mortgagee Title Insurance Policy must be issued to Lender which shall insure the validity and priority of Lender's Security Instrument as a first lien on the secured property and be acceptable to Lender, in its sole discretion." Under this condition, the lender was not required to accept a policy that "insured over" a prior lien, unless that was acceptable to the lender. The Chaireses accepted the commitment on April 11, 1988.

Mr. Chaires, a member of the Maryland bar and an authorized agent for Title U.S.A. Insurance Corporation of New York, obtained from B.F. Saul its consent for him to act as title and settlement attorney. On June 10, 1988, the title insurer, through Mr. Chaires as Authorized Signatory, issued its commitment for title insurance. It described, as the instruments required to consummate the loan commitment, only a deed of trust from the Chaireses to B.F. Saul and a release of the $350,000 mortgage to Queenstown Bank. In Schedule B, Part II, of the title insurance commitment the insurer advised that the policy would contain certain exceptions. Of relevance here are items one and four of those proposed exceptions. Item one excepted for "[d]efects, liens, encumbrances, ... if any, created ... prior to the date the proposed Insured acquires for value of record the ... mortgage thereon covered by this Commitment." Item four read as follows:

"This policy will insure that all [assessments] prior to date of issuance of this policy for a certain Shore Erosion Control Program Lien recorded among the Land Records of Anne Arundel County, Maryland at Liber 3378, folio 505 are current."

The title commitment did not state the original amount of the Shore Lien. That amount does not appear in the recorded notice of lien, but it would have been known to the Chaireses.

These proposed exceptions were not acceptable to B.F. Saul. On June 13 the lender sent Mr. Chaires its closing instructions. B.F. Saul requested Mr. Chaires to "prepare and obtain the proper execution of the necessary documents to secure a conventional ARM 597 first [lien]" on the Loudon Lane property. B.F. Saul requested a mortgagee title insurance policy "insuring the loan as a valid first lien on subject property, without exception." The instruction said that "[n]o secondary financing is permitted." Finally, referring to the itemized exceptions in the title policy commitment, B.F. Saul instructed Mr. Chaires that "[i]tems 1 [excepting all prior liens], 2, [and] 4 [insuring that the Shore Lien was then current] must be deleted from the final policy." [7]

Mr. Chaires conducted the loan closing on June 14. At that time he and Mrs. Chaires made oath on a "FannieMae" form of affidavit and agreement that they had "not given, conveyed, permitted, or contracted for . . . any lien upon the Property to secure a debt or loan except for" the B.F. Saul Loan. The Chaireses acknowledged in the FannieMae form that their representations "are made for the purpose of inducing the Lender and its assigns to make or purchase the Loan."

At the closing the Chaireses also executed a deed of trust for the benefit of B.F. Saul. The deed of trust contained a

---

7. B.F. Saul did not request the deletion of proposed exception three. It provided:

"Taxes . . . will be paid through the fiscal year ending June 30, 1988; and other public charges . . . payable on an annual basis will be paid through the year ending December 31, 1988. However, this policy of title insurance will not insure against . . . public charges, assessments or the balance thereof, for existing or proposed improvements which may have been levied or assessed . . . but which are not now due and payable to said State . . . ."

Proposed exception four, which specifically referred to the Shore Lien, seemingly has no effect different from that which would be obtained under the general language of proposed exception three, which was acceptable to the lender. As we have seen in Part I, *supra*, the lien priority conferred on an unpaid installment of a shore lien over mortgage liens earlier in time, does not convert the "leap-frogging" lien for an unpaid installment of shore lien into a lien of prior encumbrance under SMLL. Consequently, B.F. Saul's acceptance of exception three is immaterial to the estoppel analysis.

covenant under which the borrowers agreed "promptly [to] discharge any lien which has priority over this Security Instrument unless" the borrowers, in a manner approved by the lender, paid off, contested, or obtained a subordination of any such lien.

Thereafter, on June 23, 1988, the title insurer, acting through Mr. Chaires, issued its policy insuring against loss by reason of, *inter alia*, "[a]ny defect in or lien or encumbrance on [the] title." The exception for any prior liens was deleted. The title policy that was issued, however, contained in Schedule B, dealing with exceptions, a paragraph seven reading: "This policy will insure that all [assessments] prior to date of issuance of this policy for [the Shore Lien] are current. Any possible future assessments are excluded from coverage under this policy." Thus, the specific exception relating to the Shore Lien had not been removed as directed. Inasmuch as the final policy continued the general exception for future installments of benefit assessments—an exception acceptable to the lender—the specific exception for *possible* future Shore Lien assessments appeared to say no more.

Immediately after closing, B.F. Saul assigned the loan to Chevy Chase and transferred to Chevy Chase all of the loan documents, including, when and as issued, the title policy. There is no evidence that any agent of B.F. Saul or of Chevy Chase ever noted or complained to Mr. Chaires or to the title insurer about any deviation from instructions. It appears that Chevy Chase simply included the B.F. Saul Loan in its inventory of first mortgages and processed the collection of the loan in accordance with its internal procedures for first mortgage loans. Years later, the instant action was filed by the Chaireses.

Thus Mr. Chaires played multiple roles in the transaction. He was
- a borrower, together with his wife;
- settlement attorney for the lender;
- settlement attorney for himself and his wife; and
- agent for the title insurer.

The defendants raised the affirmative defense of estoppel in their answers to the original and the consolidated complaints and in their statements of defenses prior to the settlement and the scheduling conferences with the court.

A few days before trial the Chaireses filed a motion *in limine* seeking an order forbidding Chevy Chase from introducing any evidence concerning statements by the plaintiffs about the priority of the B.F. Saul Loan. In an extensive argument on the first day of trial, this motion was recognized as relating to the "estoppel defense." The Chaireses took the position that estoppel was a purely legal issue which the court should decide in their favor. Chevy Chase took the position that it had been incumbent on the settlement attorney to have raised the problem of the Shore Lien. The court granted the motion *in limine*, ruling that there could be no estoppel because the title policy specifically referred to the Shore Lien. At the conclusion of all of the evidence Chevy Chase moved for judgment as to the claims predicated on violations of SMLL on the ground that the plaintiffs were estopped from asserting the same. That motion was denied.

In *Knill v. Knill*, 306 Md. 527, 510 A.2d 546 (1986), we defined equitable estoppel to be

" 'the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part requires some corresponding right, either of property, of contract, or of remedy.' "

*Id.* at 534, 510 A.2d at 549 (quoting 3 J. Pomeroy, *A Treatise on Equity Jurisdiction* § 804, at 189 (S.W. Symons ed. 1941) (Pomeroy)). The cited work describes the general principle underlying estoppel *in pais* as loss-shifting. Pomeroy states, "When one of two innocent persons—that is, persons each guiltless of an intentional, moral wrong—must suffer a loss, it must be borne by that one of them who by his conduct—acts

or omissions—has rendered the injury possible." Pomeroy, § 803, at 187.

In *Grimberg v. Marth*, 338 Md. 546, 659 A.2d 1287 (1995), we restated the elements of estoppel, saying:

> " '[I]t is now well established that "an estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other." Indeed, all that is needed to create an equitable estoppel is (1) voluntary conduct or representation, (2) reliance, and (3) detriment.' "

*Id.* at 555–56, 659 A.2d at 1292 (quoting, *inter alia*, *Lampton v. LaHood*, 94 Md.App. 461, 475–76, 617 A.2d 1142, 1149 (1993)).

In the instant matter the voluntary conduct or representations are those of the plaintiffs, and particularly of Mr. Chaires who proceeded to disburse for his benefit and that of his wife $350,000 in loan proceeds on the security of a second lien when he had been instructed to "prepare and obtain the proper execution of the necessary documents to secure a conventional ARM 597 first [lien]." The detriment is the judgment entered by the circuit court in this matter, to the extent that it is predicated on the lender's violation of SMLL. The arguments advanced by the Chaireses center on the element of reliance. They assert that the reference in the title policy commitment and in the title policy to the Shore Lien put the lender on notice, in essence, of the nature of the operation of a shore lien and of its effect on the B.F. Saul Loan under SMLL. It may well be that the Chaireses' argument would have merit in a loan transaction in which the settlement attorney and the borrower-plaintiff were not one and the same. Higher standards apply, however, when the settlement attorney is the borrower-plaintiff, even when the lender is an institutional lender.

That Mr. Chaires acted as attorney for the lender is demonstrated by Judge Smith's opinion for the Court in *Attorney Grievance Comm'n v. Lockhart*, 285 Md. 586, 403 A.2d 1241 (1979). Lockhart acted as settlement attorney in sales of

small waterfront lots by the developer, a company that Lockhart represented generally. The lots were subject to three tiers of liens. At the respective closings, Lockhart placed in escrow funds to be used to release the liens, but later, at the direction of the seller, Lockhart disbursed the funds to the seller, apparently leaving to the seller the task of obtaining releases. *Id.* at 590, 403 A.2d at 1243. Lockhart had also certified to a title company that the properties acquired by the buyers were free and clear of liens, other than the purchase money mortgages. In that context we said:

> "Settlement lawyers in effect representing all interests, as did Lockhart, must recognize that they have a special duty to all parties to the settlement. This duty includes prompt obtention of appropriate releases of liens."

*Id.* at 597, 403 A.2d at 1247.

Further discussing the role of settlement attorneys, we quoted with approval from Annotation, *Attorney and Client: Conflict of Interest in Real–Estate Closing Situations,* 68 A.L.R.3d 967 (1976). *Lockhart,* 285 Md. at 594 n. 6, 403 A.2d at 1245 n. 6. That commentary, while recognizing that it would be impractical to require independent representation of all potentially conflicting interests in a real estate closing, at the same time recognized that representing conflicting interests " 'would interfere with the attorney-client relationship and with a client's right to expect an attorney to represent his interests to the fullest extent permitted by law.' " *Id.* (quoting 68 A.L.R.3d at 970). The resolution of the dilemma is that " 'most canons of ethics are drawn so as to permit the representation of adverse interests if full disclosure is made of potential areas of conflict, *and provided that there are no actual areas of conflict already existent between the parties.'* " *Id.* (emphasis added).

In *Atlantic Richfield Co. v. Sybert,* 295 Md. 347, 456 A.2d 20 (1983), a multi-state petroleum company unsuccessfully defended on conflict of interest grounds a claim for commissions on a sale of its real estate asserted by its attorney. That attorney's partner had been engaged by the buyer to locate a

suitable property for its petroleum storage facility and to obtain any needed zoning. In stating the legal test this Court explained that the "rigid" rule against representing adverse interests is intended, in part,

> " ' "to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent." ' "

*Id.* at 353–54, 456 A.2d at 23 (quoting, *inter alia, Derlin v. Derlin,* 142 Md. 352, 364, 121 A. 27, 31 (1923)). Nevertheless, on the facts of the case, the contract for commissions was not set aside because "the client, after full disclosure by the attorney, voluntarily and knowingly consent[ed] to the transaction." *Id.* at 359, 456 A.2d at 26. *See also Crest Inv. Trust, Inc. v. Comstock,* 23 Md.App. 280, 327 A.2d 891 (1974), *cert. denied,* 274 Md. 726 (1975) (transaction set aside for lack of full disclosure where attorney for lender also represented borrowers in business purpose loan); *United States v. Cassiere,* 4 F.3d 1006, 1023 (1st Cir.1993) (affirming conviction for wire fraud of settlement attorneys who represented lenders to whom they accordingly "had a fiduciary duty").

Cases in which an attorney borrows money from the attorney's client also emphasize the need for full disclosure. *See* J.M. Draper, *Disciplinary Action Against Attorney Taking Loan From Client,* 9 A.L.R.5th 193 (1993). "[B]ecause of the inherent possibility of conflict of interest, such transactions are always closely scrutinized for any unfairness on the attorney's part." *Id.* at 210. Referring to former DR § 5–104(a) and its present counterpart, ABA Model Rule of Professional Conduct 1.8(a), the author states:

> "Both of the rules specifically directed at business transactions between attorneys and clients mandate full disclosure of material facts to the client before the transaction is completed. And even under general professional conduct rules, or where no rule is mentioned, it is clear that, in terms of loans obtained by attorneys from their clients, this

has meant disclosure to the client of the fact that the attorney has interests in the transaction adverse to those of the client. . . ."

*Id.* at 211. Although most of the cases presented in this extensive annotation deal with clients who are relatively unsophisticated, the author states that "it appears that it is assumed that the client is expecting the attorney to be acting in the client's interests, and this is true even though the client may be a business person of great experience and sophistication." *Id.* at 214 (footnote omitted).

*In re Montgomery,* 292 Or. 796, 643 P.2d 338 (1982), involved a breach of duty by an attorney who borrowed money at a usurious rate of interest from his clients, who were sophisticated businessmen and who considered the loan a minor transaction. Although the court found that the attorney would not have raised the defense, under Oregon law the usury prevented collection of any interest and caused a forfeiture of the principal to the local school fund. The court was "convinced that the lender was relying upon [the attorney's] exercise of professional judgment, at least to the extent that (a) the loan was valid and legally enforceable, and (b) that the documents prepared by him were in proper form and evidenced a legally enforceable obligation." 643 P.2d at 340. This was because "[i]t would not occur to a trusting client that the lawyer would advise the client to enter into an unlawful contract." *Id.* at 341.

In the following passage the Oregon court distinguished the case before it from a loan involving the regular attorney for an institutional lender.

"When a lawyer regularly represents a financial institution such as a bank, savings and loan association or finance company, and applies for a loan of a type which the client makes in the normal course of business, it may be that the lawyer need not advise the client to seek independent legal counsel or otherwise advise the client in the transaction. But that is a markedly different situation from the case at bar, for there the client is knowledgeable in all phases of the

business transaction involved and no more expects professional judgment from the lawyer than it does in any other regular loan transaction with a borrower. It is clear that there is no expectation that the lawyer will 'exercise his professional judgment for the protection of the client' because the client is already fully informed."

*Id.*

In the matter now before us the loan from B.F. Saul originated as one in the regular course of its business, but it deviated from that course. B.F. Saul furnished closing instructions to its settlement attorney, and the loan would have been one in ordinary course had those instructions been followed. The obstruction was the Shore Lien. Having in hand closing instructions that called for the documents necessary to effect a first lien, Mr. Chaires did not fulfill his obligation of disclosure by relying on the reference to the Shore Lien in the commitment for title insurance. Nor could he treat that reference as having generated the client's acquiescence in closing the transaction with the prior Shore Lien still in effect, particularly when the closing instructions directed elimination of the exception for the Shore Lien, as well as of the exception for any and all liens. As attorney for the lender in the transaction, it was Mr. Chaires's duty, at a minimum, to bring the obstacle of the Shore Lien to the direct attention of an appropriate representative of B.F. Saul so that the lender could consider its options. These included withdrawing from the commitment to the Chaireses because of the failure of a condition of the commitment or requiring that the Shore Lien be paid in full.

■ We assume, most favorably to the plaintiffs, that Mr. Chaires either failed to look at the SECL or attempted to write the policy around it in the hope that that would be acceptable to B.F. Saul. Chevy Chase concedes that the assertion by the Chaireses of claims under SMLL was the result of afterthought and not part of a plot at the time the loan was made. Nevertheless, estoppel does not require that

the persons estopped intend the detriment that flows from their conduct.

Here, Mr. Chaires knew that the Loudon Lane property was subject to the Shore Lien. The estoppel results from the actual, and not simply potential, conflict existing when the loan was made. That lien secured a no interest loan from DNR on which, by Mr. Chaires's estimate, $15,000 to $17,000 remained to be paid as of the time of the B.F. Saul Loan. Thus, in addition to some $6,000 in fees and closing costs that the Chaireses would have to pay in order to borrow the $350,000 to repay Queenstown Bank, the Chaireses would have to produce an additional $15,000 to $17,000 in order to satisfy the objectives of Mr. Chaires's client, should the client decide not to make the loan unless the Shore Lien was released. This conflict of interests places Mr. Chaires in a position where, whether intentionally or not, his inadequate disclosure in violation of his duty to the client operated for his benefit and that of Mrs. Chaires.

The Chaireses argue that, after receipt of the commitment for title insurance, the lender never requested that Mr. Chaires obtain from DNR a subordination of the Shore Lien to the B.F. Saul Loan. That was not an option available to the lender. When the subject loan was made on June 14, 1988, DNR's authority to subordinate was limited "to grant[ing] precedence to a subsequent purchase money mortgage if necessary for transfer of a benefited property." Md.Code (1974, 1983 Repl.Vol.), NR § 8–1006(c). The B.F. Saul Loan was a refinancing. The authority for DNR to subordinate for refinancing was conferred by Chapter 174 of the Acts of 1988, effective July 1, 1988.

Public policy is also invoked by the Chaireses who submit that estoppel cannot be applied to bar a claim based upon a statute that is intended to protect the party against whom estoppel is asserted. In making this argument Mr. Chaires seeks to don exclusively his hat as a borrower for consumer purposes, and he totally ignores his relationship to the lender as title and settlement attorney. It is the latter relationship

that gives rise to the estoppel. *Messick v. Smith*, 193 Md. 659, 69 A.2d 478 (1949), *reh'g denied*, 193 Md. 671, 72 A.2d 249 (1950), on which the Chaireses rely, does not involve estoppel and does not involve the attorney-client relationship.[8] Nor does the jury's finding that Chevy Chase "knowingly" violated SMLL prevent an estoppel from arising. Under the facts of the instant matter estoppel was a legal question for the court to decide; there was no jury issue.

Further, by assignment of the mortgage from B.F. Saul, Chevy Chase acquired all of the rights of B.F. Saul, including the right to assert estoppel. The estoppel operates with respect to Mrs. Chaires as well as Mr. Chaires because the Loudon Lane property was held as tenants by the entireties, Mr. Chaires acted as agent for Mrs. Chaires in complying with the conditions of the loan commitment, and the effect of the inadequate disclosure by Mr. Chaires, as attorney for all parties to the loan, operated to her immediate benefit.

### III

Because Chevy Chase prevails on the estoppel issue, there is no need for us to opine on Chevy Chase's defense of federal preemption, or on whether that defense had been waived, as the trial court held.

Both parties also briefed the issue of attorney's fees in the context of the total judgment, including the portions of that judgment which we now reverse. In view of the foregoing holdings, counsel fees must be redetermined.

---

8. *Messick* involved an application of the doctrine of unclean hands in a mechanic's lien action brought by a home builder. In order to obtain materials under a priority that was available to veterans of World War II during the immediate post-war materials shortage, the homeowner, a veteran, and the builder entered into a written contract at a price within the price limits set by the priority program. The parties' actual, oral contract called for a price in excess of the price ceiling. In defense to the mechanic's lien action the homeowner claimed unclean hands based on the written contract. This Court allowed the defense as to the portion of the claim that exceeded the price ceiling but disallowed the defense as to the portion of the claim within the price ceiling, as reflected in the written contract.

The effect of the foregoing holdings on the judgment is as follows:

1. The judgment on Count One, illegal lending practices under SMLL, is reversed.

2. The judgment on Count Two in favor of Mrs. Chaires, based on violations of the Maryland Consumer Debt Collection Act, is affirmed.

3. The judgment on Count Three, for breach of contract, is affirmed.

4. The declaratory judgment entered on Count Five is reversed, and the Circuit Court for Prince George's County is directed, on remand, to enter a judgment declaring that Chevy Chase has no liability to the plaintiffs under SMLL.

5. As a result of the reversal of the judgments on Counts One and Five, the judgment for counsel fees in favor of Mr. Chaires, which is based entirely on violations of SMLL, is reversed.

6. The judgment in favor of Mrs. Chaires for counsel fees is vacated and that issue is remanded to the Circuit Court for Prince George's County to determine an attorney's fee "reasonably related to" violations of the Maryland Consumer Debt Collection Act, as incorporated into the Consumer Protection Act, but excluding any fee allocable to violations of SMLL. *Continental Casualty Co. v. Board of Educ.*, 302 Md. 516, 532, 489 A.2d 536, 544 (1985).

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED IN PART AND REMANDED IN PART. COSTS TO BE PAID TEN PERCENT BY THE APPELLANT, CHEVY CHASE BANK, FSB, AND NINETY PERCENT BY THE APPELLEES, WILLIAM M. CHAIRES AND LAURIE G. CHAIRES.**